[Crim. No. 6808. In Bank. July 24, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. DAVID JACOB SEITERLE, Defendant and Appellant.

Earl Klein, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

GIBSON, C. J.—Defendant was indicted for the murders of Mr. and Mrs. Charles Duvel, and as to both counts he pleaded guilty to murder in the first degree. He also entered pleas of guilty with respect to charges of several other crimes, including two counts of kidnaping for purposes of robbery with bodily harm and one count of conspiracy to commit murder in the first degree. Upon a trial on the sole issue of penalty, the jury fixed his punishment at death for each of the murders and at life imprisonment for each of the kidnaping offenses and for the conspiracy to commit murder.[1] The appeal comes to us automatically under subdivision (b) of section 1239 of the Penal Code.

On the evening of August 10, 1960, defendant, who was 19 years of age, met two 16-year-old boys, Karl Gentry and Thomas O'Hara, and they drank several cans of beer while driving in defendant's car. They went to O'Hara's house where they obtained a BB pistol which "looked like a real gun," and defendant said something about "pulling a holdup." Defendant also stated that he needed new tires for his car, and at Gentry's suggestion they stole a car and took three tires from it. After they drank more beer, defendant suggested "holding up a house" with the gun. He said he knew some people who kept a large amount of money in their house, and he drove to the home of Charles Duvel. The evidence is conflicting as to whether defendant said it would be necessary to kill the Duvels because they would recognize him.

[1] In regard to the other offenses to which defendant pleaded guilty, namely, robbery, grand theft, burglary, attempted burglary and conspiracy to commit robbery, the court sentenced defendant to imprisonment for the term prescribed by law.

Mr. Duvel came to the door when defendant knocked. Defendant drew the gun, entered the house with Gentry and demanded to know where the Duvels kept their money. Mr. Duvel led them to a bedroom where he took about $200 from a small dresser and gave it to defendant. Mr. Duvel was compelled to remove his pajamas and lie prone on a bed, and defendant, using drapery cords and nylon socks, tied him to the bed posts. Mrs. Duvel was forced to remove the blouse of her pajamas and lie on a bed while she was also tied to bed posts. Gentry searched the house for more money, found a strongbox, and gave it to O'Hara, who had entered the house while the Duvels were being tied. O'Hara opened the box, found it empty and left the house. Defendant met Gentry in another room, and they went back to the bedroom to gag the Duvels.

There is a conflict in the evidence as to what occurred when Gentry and defendant returned to the bedroom.

According to the testimony of Gentry, defendant started to choke Mrs. Duvel with a nylon sock and told him to do the same to Mr. Duvel, but he was unable to do so because he was not strong enough. Gentry said that he stabbed Mr. Duvel four times with a knife he had taken earlier from the kitchen in order to cut the drapery cords. He then felt for Mrs. Duvel's pulse, could not find it and told defendant she was dead, but defendant disagreed and said to "make sure." Gentry stabbed her seven or eight times and Mr. Duvel three more times.

According to the testimony of defendant, Gentry stabbed Mr. Duvel once or twice when they returned to the bedroom, and defendant became sick and went immediately to the bathroom without strangling or otherwise harming the Duvels. Gentry came into the bathroom, divided the money with defendant and said he was going back "to finish the Duvels off." Defendant went to the car, and Gentry came out of the house four or five minutes later.

An autopsy established that the Duvels died as a result of stab wounds and that Mrs. Duvel might have died from strangulation if she had not been stabbed.[2]

 The court instructed the jury that the punishment for the offenses of murder, kidnaping for purposes of rob-

---

[2]Gentry and O'Hara were indicted for the same crimes as defendant and entered pleas of guilty on all counts. Since they were under 18 years of age at the time of the commission of the crimes, they were not subject to the death penalty. (Pen. Code, § 190.1.)

bery with bodily harm and conspiracy to commit murder is death or confinement in the state prison for life, at the discretion of the jury; that the jury, in determining what punishment defendant should receive, might consider the consequences of the two possible sentences; that a prisoner sentenced to either death or life imprisonment may be pardoned or have his sentence reduced by the Governor; and that a prisoner serving a life sentence may be paroled after he has served seven years. The jury was unable to reach a verdict on the first day of its deliberations, and it returned on the following morning and asked the court to clarify the definition of life sentence, to state whether life sentences for the offenses under consideration would run consecutively or concurrently, and to repeat the instructions. The court stated that a life sentence is from seven years to life, that under section 669 of the Penal Code life sentences will merge and run concurrently, and that there is no such thing as consecutive life sentences, and the instructions theretofore given were repeated. After several hours of further deliberations, the jury returned the verdicts fixing the punishment at death for the murders and at life imprisonment for the offenses of kidnaping and conspiracy to commit murder.

Section 209 of the Penal Code provides, ". . . any person who kidnaps or carries away any individual to commit robbery . . . is guilty of a felony and upon conviction thereof shall suffer death or shall be punished by imprisonment in the state prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person or persons subjected to such kidnaping suffers or suffer bodily harm. . . ."[3] In sentencing defendant in accordance with the jury's verdicts, the judgment did not specify that the punishment of life imprisonment for the kidnapings was imposed without possibility of parole.

In view of defendant's pleas of guilty on the two kidnaping counts, he could not be paroled under any circumstances. The jury was not so instructed but, to the contrary, without qualification as to any of the offenses involved, was erroneously told that a prisoner serving a life sentence might be paroled after seven years. The fact that the jury considered the possibility of parole important is demonstrated by the questions it asked of the trial judge, and, had it realized that

[3]The provisions of section 209 of the Penal Code do not, of course, affect the constitutional power of the Governor to grant reprieves, pardons, and commutations of sentence. (Cal. Const., art. VII, § 1.)

defendant could not be paroled if sentenced to life imprisonment for the kidnapings, it might not have fixed his punishment at death for the first degree murders.

For the reasons stated the judgment is reversed insofar as it relates to the issue of penalty for the offenses of first degree murder. Since the portion of the judgment imposing the sentences of life imprisonment for the offenses of kidnaping does not specify that the punishment is imposed ''without possibility of parole,'' that portion of the judgment is modified by adding the quoted words and as so modified is affirmed. In all other respects the judgment is affirmed.

Traynor, J., Schauer, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.