[Crim. No. 8690. In Bank. Dec. 15, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. JESSE JAMES GILBERT and ROBIN CHARLES KING, JR., Defendants and Appellants.

Hugh R. Manes, under appointment by the Supreme Court, and Erling J. Hovden, Public Defender (Los Angeles), J. Stanley Brill and James L. McCormick, Deputy Public Defenders, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

TRAYNOR, C. J.—Defendants were convicted on two counts of first degree murder (Pen. Code, §§ 187, 189), one count of first degree robbery (Pen. Code, §§ 211, 211a), and four counts of kidnaping for the purpose of robbery (Pen. Code, § 209). On each count of first degree murder, defendant King's penalty was fixed at life imprisonment and defendant Gilbert's penalty was fixed at death. (Pen. Code, §§ 190, 190.1.) The trial court sentenced King to prison for the term prescribed by law on all counts and sentenced Gilbert to death on the two murder counts and to prison on the remaining counts for the term prescribed by law. King appeals from the judgment of conviction. Gilbert's appeal is automatic. (Pen. Code, § 1239, subd. (b).)

Shortly after 10:30 a.m., January 3, 1964, defendant Gilbert and Edgar Ball Weaver entered an Alhambra savings and loan association office, hereafter referred to. as a bank, wearing hats and sunglasses. Gilbert, armed with an automatic pistol, shouted, ''Everybody freeze; this is a hold-

up.'' He threw a paper shopping bag with the name Alpha Beta on it at one of the tellers and told her to fill it with money. Weaver, armed with a revolver, stood by the door and kept the bank covered while Gilbert forced an accountant to open the vault and directed the senior teller and the controller to open compartments inside. After obtaining only a box of rolled coins from the vault, Gilbert retrieved the shopping bag and began to fill it with money from the tellers' drawers.

Alhambra Police Officer George Davis, who had been alerted to the robbery, entered the bank with a shotgun and disarmed Weaver. Gilbert then grabbed a woman teller and pushed her toward the door, pointing his pistol at her head and warning Davis: ''Drop that gun and back off or I'll shoot the woman.'' Davis backed toward the front door, saying, ''No you won't; you will never shoot.'' Officer Billy Edward Nixon then arrived at the bank in a police car and saw Officer Davis backing out of the front door with a shotgun. As Gilbert followed Davis out of the bank, he pushed the woman toward Davis and fired, mortally wounding Davis. Weaver picked up his revolver and followed Gilbert out of the bank. As they fled, Officer Nixon shot and wounded Weaver.

Gilbert and Weaver escaped in a white automobile. A witness gave the license number to Officer Nixon, and several bystanders directed him as he pursued the automobile. Several blocks from the bank a man ran up to Officer Nixon and told him that two men who seemed to be trying to get away from something left a white automobile and entered another white automobile and continued north on Granada. Officer Nixon found an unoccupied white automobile with the license number that had been given to him parked facing north on Granada. Farther north on the same street he saw a green automobile that had run over the curb and crashed into a tree. Weaver was inside, semiconscious and bleeding, with a revolver on the seat beside him. Weaver died in the hospital later that evening from a bullet that had entered his back.

Law enforcement officers questioned defendant King about the robbery twice on January 5, two days after the robbery, and again on January 10, when he came to the Alhambra police station pursuant to a request. On each occasion he denied knowledge of the robbery. The San Gabriel police arrested him on February 7, and on February 11 took him to the Alhambra police station. Upon being told that he was

being booked on charges of murder, robbery, and kidnaping, King became very talkative and began to disclose his participation in the robbery. A police officer told him to wait until booking had been concluded before making any statements. He was taken into an interrogation room and during a seven-hour session gave detailed statements about his participation in the robbery.

King told the officers that he met Weaver at a parole meeting. Although he refused to help Weaver rob a "bookie joint," he later accepted Weaver's offer of $100 to steal an automobile. On the morning of January 3, 1964, King stole a white automobile and drove it to Los Feliz and San Fernando Road. A friend followed in King's own white automobile. Gilbert and Weaver arrived in a green automobile at 10 a.m., and King and his friend followed them to Alhambra. Gilbert and Weaver parked the green automobile and took the stolen automobile. For $1,000 King agreed to wait for them and to drive Gilbert back to Glendale.

After leaving his friend at a bowling alley, King waited for Gilbert and Weaver. When they returned, Weaver, who was bleeding badly, got into the green automobile, and Gilbert got into King's automobile with a shopping bag. Gilbert put a .45 automatic pistol against King's stomach and threatened to kill him unless he did what he was told.

King drove to Gilbert's apartment in Glendale. On the way, Gilbert told King that he and Weaver had robbed a bank. He said that when a policeman entered the bank he used a woman as a hostage and forced the policeman to back out the door. He shot the policeman and fired two shots at another officer who was sitting in a police car. Gilbert said, "I have killed one cop today, and I will kill a lot more before I am through." He also said that he thought that Weaver got in his line of fire and that he had accidentally shot Weaver.

When they arrived at Gilbert's apartment, King waited with the shopping bag while Gilbert obtained a key from the manager. After Gilbert changed clothing, he offered King $1,000 to drive him to Salt Lake City. When King refused, Gilbert came toward him holding a pillow. King heard a click and realized that a pistol under the pillow had misfired. He begged for his life, and, after a few moments, Gilbert said that he was not going to kill him. Gilbert gave King $1,300, and they left the apartment. King waited while Gilbert returned the key to the manager. They drove to an alley where

Gilbert threw his .45 automatic pistol into a garbage can. They went to a bar, and, shortly after Gilbert met a woman friend, he allowed King to leave.

King's statements were admitted into evidence at the trial on the issue of guilt. He contends that they were erroneously admitted over his objection.

■ Incriminating statements are inadmissible if they were obtained when "(1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his right to remain silent, and no evidence establishes that he waived those rights." (*People* v. *Dorado*, 62 Cal.2d 338, 353-354 [42 Cal.Rptr. 169, 398 P.2d 361]; *Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977].)

■ King's statements were admitted in violation of this rule. When King made them he was in custody and the investigation was no longer a general inquiry into an unsolved crime but had focused upon him. When the police took him into the interrogation room shortly after 3 p.m. on February 11, their purpose was to elicit incriminating statements. A short time after the interview began a tape recorder was started without King's knowledge. At 10 p.m. King was asked to make a formal tape recording for use in court. When he refused to do so he was asked to dictate a statement to be used in court. King said that he would make a statement, but that he would not sign it until he had advice from an attorney. At no time was he advised of his right to counsel or of his right to remain silent.[1] Accordingly, the statements should have been excluded.

---

[1] On *voir dire* examination, King testified that after he was told of the charges against him he asked for an attorney and that he made his statements only after his request was refused. His testimony was controverted, however, by the testimony of an Alhambra police officer who said that King did not ask for an attorney before making his statements. The trial court found that King made his statements without requesting counsel, and, interpreting *Escobedo* v. *Illinois*, 378 U.S. 478, [84 S.Ct. 1758, 12 L.Ed.2d 977], to require a request for counsel (see *People* v. *Dorado*, 62 Cal.2d 338, 347-351 [42 Cal.Rptr. 169, 398 P.2d 361]), admitted his statements. On the other hand, the court excluded a statement obtained from Gilbert on the ground that he requested counsel and was denied counsel. Gilbert, who knew of his rights, said during his interrogation, "I want an attorney present during all my answers. I know anything I say is going to be held against me."

The Attorney General contends, however, that King's statements were not obtained by a process of interrogations that lent itself to eliciting incriminating statements since King began voluntarily to disclose his participation in the robbery before he was asked any questions and before he was taken into the interrogation room. We do not agree with this contention. The statements that were introduced at the trial were not spontaneous, unsolicited declarations but detailed statements obtained through a period of prolonged interrogation.

In *People* v. *Stewart*, 62 Cal.2d 571, 578 [43 Cal.Rptr. 201, 400 P.2d 97], we pointed out that in most cases an interrogation following an arrest will lend itself to eliciting incriminating statements. (See also *People* v. *Bilderbach*, 62 Cal.2d 757, 761-762 [44 Cal.Rptr. 313, 401 P.2d 921].) When King made his statements he was not only under arrest but had been in custody for four days. He had been interrogated three times previously concerning the robbery. When the police formally charged him with murder, robbery and kidnaping, the accusatory stage had been reached. When they took him into the interrogation room, their purpose was to elicit incriminating statements, and they had a duty to advise him of his constitutional rights.

In *People* v. *Cotter, ante,* pp. 386, 393, 398 [46 Cal. Rptr. 622, 405 P.2d 862], and *People* v. *Jacobson, ante,* pp. 319, 329, 331 [46 Cal.Rptr. 515, 405 P.2d 555], we held that the fact that a defendant is willing to confess and has already volunteered incriminating statements and confessions does not absolve the police of the duty to advise him of his constitutional rights before eliciting further confessions at stationhouse interrogations. We further held, however, that error in admitting confessions so elicited in the absence of such warning is not prejudicial when there are also in evidence equally damaging admissible confessions that were made before the police improperly elicited the inadmissible confessions.

In the present case, however, the booking officer did not testify to the details of what King volunteered before he was formally interrogated. The officer stated only the conclusions he drew therefrom. There is nothing in the record to indicate that King's volunteered statements during booking were not wholly consistent with his testimony at the trial that he had no knowledge of the planned robbery until after it occurred. There is evidence, however, that King admitted

guilty knowledge of the plans of Weaver and Gilbert only after prolonged interrogation. Thus, King's inadmissible statements were not merely cumulative of equally damaging admissible statements.

There is also no merit in the contention that the erroneous admission of King's statements was not prejudicial to him because he took the stand and testified to committing the same acts that he had admitted in his statements. When King testified, the only evidence other than his statements that had been introduced to connect him with the crime was a fingerprint identified as his on a shopping bag similar to the one that had been used in the robbery. Since the details of his volunteered statements during booking are not in evidence, it is impossible to determine whether detailed evidence of those statements alone would have impelled his testimony. The detailed inadmissible statements, including admissions of guilty knowledge, clearly left King no choice but to take the stand and attempt to exculpate himself by testifying that he did not know that Gilbert and Weaver intended to commit a robbery. Thus, King's testimony cannot be segregated from his erroneously admitted statements to sustain the judgment. (*Fahy* v. *Connecticut,* 375 U.S. 85, 91 [84 S.Ct. 229, 11 L.Ed.2d 171]; *People* v. *Davis,* 62 Cal.2d 791, 796 [44 Cal. Rptr. 454, 402 P.2d 142]; *People* v. *Ibarra,* 60 Cal.2d 460, 463 [34 Cal.Rptr. 863, 386 P.2d 487]; *People* v. *Dixon,* 46 Cal.2d 456, 458 [296 P.2d 557].) Accordingly, the judgment convicting King must be reversed.

Defendant Gilbert contends that since King's statements and testimony implicated him, the error was also prejudicial as to him, thereby compelling reversal. In *People* v. *Aranda, ante,* pp. 518, 526 [47 Cal.Rptr. 353, 407 P.2d 265], we held that instructions that an erroneously admitted confession of one defendant implicating his codefendant should be considered against the former only did not cure the error as to the latter. We pointed out that "The giving of such instructions, however, and the fact that the confession is only an accusation against the nondeclarant and thus lacks the shattering impact of a self-incriminatory statement by him (see *People* v. *Parham,* 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001]) preclude holding that the error of admitting the confession is always prejudicial to the nondeclarant." This rule also applies to King's testimony that was impelled by the erroneous admission of his statements.

■ The effect of King's statements as an accusation against Gilbert was somewhat vitiated by the trial court's instruction that the jury should not consider them as evidence against Gilbert. King's testimony was less damaging to Gilbert than his statements, and the trial court instructed the jury that such testimony must be corroborated and should be viewed with distrust. Regardless of the efficacy of these instructions, King's statements and testimony cannot be considered prejudicial in face of the overwhelming evidence of Gilbert's guilt. Eight witnesses who were present in the bank unequivocally identified Gilbert as one of the robbers, and incriminating evidence was found in his apartment, including a drawing of the Alhambra bank area with writing on it identified as Gilbert's. Under these circumstances, there is no reasonable possibility that the error in admitting King's statements and testimony might have contributed to Gilbert's conviction. (Cal. Const., art. VI, § 4½; *Fahy* v. *Connecticut,* 375 U.S. 85, 86-87 [84 S.Ct. 229, 11 L.Ed.2d 171]; *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

■ Nor was the admission of King's statements and testimony at the trial on the issue of guilt prejudicial on the issue of Gilbert's penalty. At the trial on the issue of penalty King's statements were not reintroduced, King did not testify, and the district attorney did not comment upon his statements or testimony in arguing to the jury. Most of the prosecution's evidence at the penalty trial was introduced to show facts in aggravation of Gilbert's penalty. Gilbert was convicted in 1947 of second degree murder upon a plea of guilty for killing a fellow prisoner while serving a term in San Quentin. He was released on parole in 1959, and convicted of burglary in 1960. He escaped from prison in July 1963, and committed a series of armed bank robberies on October 28, December 6, December 20, December 23, and December 31, 1963.[2] In the face of such facts in aggravation of the penalty and of the circumstances of the killing of Officer Davis, the erroneous admission of King's statements at the trial on the issue of guilt was not prejudicial on the question of Gilbert's penalty. (Cal. Const., art. VI, § 4½; *Fahy* v. *Connecticut,* 375 U.S. 85, 86-87 [84 S.Ct. 229, 11 L.Ed.2d

---

[2]The trial court instructed the jury to disregard these crimes unless it believed beyond a reasonable doubt that the evidence established that Gilbert was guilty of committing them. (See *People* v. *Terry,* 61 Cal.2d 137, 149, fn. 8 [37 Cal.Rptr. 605, 390 P.2d 381].)

171]; *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

Gilbert also contends that the trial court erroneously refused to instruct the jury to disregard King's testimony as evidence against him, on the ground that such testimony was not part of the People's evidence and was introduced after he rested his case. The contention is frivolous that the corroborated testimony of an accomplice cannot be considered as evidence against a defendant who is tried separately. (Pen. Code, § 1111.) Likewise a defendant has no ground to object to his accomplice's testimony because he is tried jointly. ██ It is true that when the accomplice is also on trial, the prosecution may not call him as a witness. (Pen. Code, § 1323.5.) It does not follow, however, that if he chooses to take the stand his testimony is limited to himself, for accomplices are competent to testify for or against each other, whether they are tried jointly or severally. (Pen. Code, §§ 1321, 1323.5; Code Civ. Proc., § 1879.)[3]

Both defendants contend that since their accomplice was killed by a police officer, the felony-murder doctrine cannot be invoked to convict them of first degree murder for that killing. (Count II.) In *People* v. *Washington,* 62 Cal.2d 777, 781-782 [44 Cal. Rptr. 442, 402 P.2d 130], we held that since the purpose of the common-law felony-murder rule is to deter felons from killing negligently or accidentally by holding them strictly responsible for killings they commit, malice aforethought cannot be imputed under that rule unless a felon commits the killing. We recognized, however, that entirely apart from the felony-murder rule, malice may be established when a defendant initiates a gun battle, and that under such circumstances he may be convicted of murder for a killing committed by another. ██ Although the evidence in the present case would support a conviction of first degree murder on the ground that Weaver was killed in response to a shooting initiated by Gilbert, the court did not instruct the jury on that ground, but gave an erroneous instruction that defendants could be convicted of murder for that killing

---

[3] A defendant who can show prejudice from being tried jointly with others, however, may move for a severance under Penal Code, section 1098. (Cf. *People* v. *Clark,* 62 Cal.2d 870, 883-885 [44 Cal.Rptr. 784, 402 P.2d 856]; *People* v. *Aranda, ante,* pp. 518, 529 [47 Cal.Rptr. 353, 407 P.2d 265].) Although each defendant has the benefit of a presumption of innocence and a privilege against self-incrimination, due process of law does not require that the prosecution rely solely upon its own proof in establishing its case.

without proof of malice and solely on the ground that they committed a robbery that was the proximate cause of their accomplice's death. This instruction withdrew from the jury the crucial issue of whether the shooting of Weaver was in response to the shooting of Davis or solely to prevent the robbery. Since defendants have a constitutional right to have the jury determine every material issue presented by the evidence, the denial of that right was a miscarriage of justice within the meaning of article VI, section 4½ of the California Constitution. (*People* v. *Modesto,* 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33], and cases cited.)

Regardless of the conclusion that the jury, properly instructed, might have reached on Gilbert's liability for the death of his accomplice, that death was a circumstance of the murder of Officer Davis that the jury could properly consider in aggravation of the penalty for that murder. (Pen. Code, § 190.1.) Thus, the error was not prejudicial to Gilbert on the issue of the penalty for Davis' murder. Accordingly, he is not entitled to a new penalty trial as to that count.

Since the application of the principles of criminal liability for a killing committed by another may arise upon King's retrial, it is appropriate here to define that liability. The following principles may be invoked to convict a defendant of first degree murder for a killing committed by another:

(1) *Proof of malice aforethought.* "Murder is the unlawful killing of a human being, with malice aforethought." (Pen. Code, § 187.) Such malice is implied under Penal Code section 188 when the defendant or his accomplice " 'for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death.' " (*People* v. *Washington,* 62 Cal.2d 777, 782 [44 Cal.Rptr. 442, 402 P.2d 130], quoting *People* v. *Thomas,* 41 Cal.2d 470, 480 [261 P.2d 1] [concurring opinion].) Initiating a gun battle is such an act.

(2) *The killing must be attributable to the act of the defendant or his accomplice.* When the defendant or his accomplice, with a conscious disregard for life, intentionally commits an act that is likely to cause death, and his victim or a police officer kills in reasonable response to such act, the defendant is guilty of murder. In such a case, the killing is attributable, not merely to the commission of a felony, but to the intentional act of the defendant or his accomplice committed with conscious disregard for life.

■ Thus, the victim's self-defensive killing or the police officer's killing in the performance of his duty cannot be considered an independent intervening cause for which the defendant is not liable, for it is a reasonable response to the dilemma thrust upon the victim or the policeman by the intentional act of the defendant or his accomplice. (See Hart and Honore, Causation in the Law, pp. 296-299; Hall, General Principles of Criminal Law (2d ed.) pp. 270-281.)

■ (3) *Vicarious criminal liability.* Under the rules defining principals and criminal conspiracies, the defendant may be guilty of murder for a killing attributable to the act of his accomplice. To be so guilty, however, the accomplice must cause the death of another human being by an act committed in furtherance of the common design. (*People v. Schader,* 62 Cal.2d 716, 731 [44 Cal.Rptr. 193, 401 P.2d 665]; *People v. Boss,* 210 Cal. 245, 249 [290 P. 881]; *People v. Ferlin,* 203 Cal. 587, 597 [265 P. 230].)

(4) *The application of Penal Code section 189.* ■ When murder is established under Penal Code sections 187 and 188 pursuant to the principles defined above, section 189 may properly be invoked to determine the degree of that murder. Thus, even though malice aforethought may not be implied under section 189 to make a killing murder unless the defendant or his accomplice commits the killing in the perpetration of an inherently dangerous felony (*People v. Washington,* 62 Cal.2d 777, 780-783 [44 Cal.Rptr. 442, 402 P.2d 130]; *People v. Ford,* 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892]), when a murder is otherwise established, section 189 may be invoked to determine its degree.

■ Defendants contend that the trial court erred in admitting evidence illegally obtained by a search of Gilbert's apartment. At a hearing outside the presence of the jury the prosecution introduced evidence of the following facts:

Weaver was taken to the hospital shortly after Officer Nixon found him in the crashed automobile. At the hospital he told an F.B.I. agent[4] that he committed the robbery with a man named Gilbert who lived in apartment 28 of a certain apartment house on Los Feliz Boulevard in Glendale. Pursuant to a broadcast of this information, agent Kiel located the apartment house at 1 p.m. When he arrived he saw a man talking to the manager. After the man left, Kiel talked to the

---

[4]It is a violation of U.S. Code, title 18, section 2113, to rob a savings and loan association whose accounts are insured by the federal government.

■

manager, who told him that Mr. Flood, one of the two men who rented apartment 28 the previous day, had left just as he arrived. Kiel relayed this information to agent Schlatter and several other officers when they arrived 10 minutes later. Schlatter obtained a key from the manager and the officers entered the apartment. They found it unoccupied. On the coffee table Schlatter noticed a notebook with a drawing of the area of the Alhambra bank. Inside an Alpha Beta shopping bag he found some rolls of coins bearing the name of the bank. He found an ammunition clip from a .45 caliber automatic pistol, and another agent found on top of a bedroom dresser an envelope from a photography studio with a photograph of Gilbert inside. The photograph was shown to bank employees for identification.

Even though the officers entered Gilbert's apartment without a warrant,[5] the trial court properly admitted into evidence the articles found in the apartment and testimony by fingerprint experts who found fingerprints of Gilbert and Weaver in the apartment and King's fingerprint on the shopping bag. A search without a warrant is reasonable when it is incident to a lawful arrest (*Ker* v. *California*, 374 U.S. 23 [83 S.Ct. 1623, 10 L.Ed.2d 726] ; *Harris* v. *United States*, 331 U.S. 145 [67 S.Ct. 1098, 91 L.Ed. 1399] ; *People* v. *Boyles*, 45 Cal.2d 652 [290 P.2d 535]),[6] or is justified by a pressing emergency (*People* v. *Roberts*, 47 Cal.2d 374, 377-378 [303 P.2d 721] ; see *McDonald* v. *United States*, 335 U.S. 451, 454 [69 S.Ct. 191, 93 L.Ed. 153]). ▮ It is also reasonable when the officers enter in fresh pursuit of escaping felons to make an arrest.

▮ The officers identified Gilbert and found out where he lived less than two hours after the robbery. En route to Gilbert's apartment, agent Schlatter heard over the radio that three men were suspected of committing the robbery and

---

[5]The officers later obtained warrants to seize the articles found in the apartment.

[6]A search cannot be justified as incident to an arrest unless it is substantially contemporaneous with the arrest and confined to the immediate vicinity of the arrest. (*Agnello* v. *United States*, 269 U.S. 20 [46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409] ; *People* v. *Cruz*, 61 Cal.2d 861, 865-866 [40 Cal.Rptr. 841, 395 P.2d 889] ; *Castaneda* v. *Superior Court*, 59 Cal.2d 439, 442 [30 Cal.Rptr. 1, 380 P.2d 641] ; *Tompkins* v. *Superior Court*, 59 Cal.2d 65, 67 [27 Cal.Rptr. 889, 378 P.2d 113] ; *People* v. *Gorg*, 45 Cal.2d 776, 781 [291 P.2d 469].) Therefore, probable cause to arrest Gilbert is not alone sufficient to justify a search of his apartment. (See *Stoner* v. *California*, 376 U.S. 483, 486-487 [84 S.Ct. 889, 11 L.Ed.2d 856].)

that two of them had escaped in the same automobile. When Schlatter arrived at the apartment, agent Kiel told him that one of the occupants had just left. Schlatter testified that "we knew . . . there were three robbers. One was wounded and accounted for, one had just left a few minutes before, and there was a third unaccounted for. Presumably he was in the apartment." Since the officers were in fresh pursuit of two robbers who escaped in the same automobile, agent Schlatter's assumption was not unreasonable. The officers entered, not to make a general exploratory search to find evidence of guilt, but in fresh pursuit to search for a suspect and make an arrest. A police officer had been shot, one suspect was escaping, and another suspect was likely to escape. Under these circumstances the officers were not required to demand entrance and announce their purpose (Pen. Code, § 844), for to do so might have alerted the suspect and increased the officers' peril. (See *Ker* v. *California*, 374 U.S. 23, 37-41 [83 S.Ct. 1623, 10 L.Ed.2d 726] ; *People* v. *Maddox*, 46 Cal.2d 301, 305-306 [294 P.2d 6].)

The search in the present case is thus different from the search condemned in *Stoner* v. *California*, 376 U.S. 483 [84 S.Ct. 889, 11 L.Ed.2d 56]. In that case, two days after the robbery of a food market, police officers identified the defendant as one of the two robbers. Without a warrant, the officers went to the defendant's hotel where a clerk let them into his room. They had no reason to believe that the defendant was in his room, for his key was in his mailbox at the hotel desk. The officers were not in fresh pursuit of escaping robbers, and they therefore had no reason to believe that the accomplice was in defendant's room. Moreover, they had time to obtain a warrant. Accordingly, there were no exigent circumstances such as existed in the present case to justify the search.

The search in the present case was also properly limited to and incident to the purpose of the officers' entry. While the officers were looking through the apartment for their suspect they could properly examine suspicious objects in plain sight. (*People* v. *Roberts*, 47 Cal.2d 374, 378-380 [303 P.2d 721].) Moreover, they could properly look through the apartment for anything that could be used to identify the suspects or to expedite the pursuit. Accordingly, the evidence obtained through the search was properly admitted.

Defendant Gilbert makes several other contentions that affect him only.

He contends that handwriting exemplars were obtained from him by deceit and in the absence of counsel in violation of the principles of *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and that the exemplars were erroneously admitted at the trial along with testimony based upon them by an expert who identified Gilbert's handwriting on the bank area drawing found in his apartment. Since we agree with the Attorney General's contention that Gilbert waived any rights that he might have had before he made the exemplars, we need not decide whether handwriting exemplars are properly within the rule of *Escobedo* v. *Illinois, supra.* We also agree that there is no evidence of improper deception by the authorities.

F.B.I. Agent Dean arrested Gilbert in Philadelphia on February 26, 1964. When Dean attempted to interrogate Gilbert about the Alhambra bank robbery, Gilbert refused to talk until he obtained the advice of counsel. Later that day, agent Shanahan interviewed Gilbert. Shanahan told him that he was not required to say anything without advice from an attorney and that any statement he made might be used against him. Gilbert agreed to talk about anything except the California robbery. Shanahan interrogated Gilbert about robberies in Philadelphia in which a demand note had been used and he asked Gilbert for a sample of his handprinting. Gilbert voluntarily wrote some exemplars. Shanahan testified that he obtained those exemplars for the purpose of investigating the Philadelphia robberies and that they were thereafter filed by the F.B.I. in the same manner as fingerprints. He did not tell Gilbert that the exemplars would not be used in any other investigation. Thus, even if Gilbert believed that his exemplars would not be used in California, it does not appear that the authorities improperly induced such belief.

Gilbert further contends that *Escobedo* requires the exclusion of testimony of witnesses who identified him as one of the robbers after they attended a police ''show-up'' in which he appeared without counsel after indictment.[7]

We rejected a similar contention in *People* v. *Lopez,* 60

---

[7] Gilbert also contends that he was taken from the jail to the ''show-up'' at the police building without authorization in violation of Penal Code section 4004. The prosecution was not required to establish such authorization as a foundation for the testimony of witnesses who identified Gilbert, and we must presume that official duty was regularly performed. (Code Civ. Proc., § 1963, subd. 15.) Moreover, we see no compelling reason to adopt an exclusionary rule to enforce compliance with section 4004.

Cal.2d 223, 241-244 [32 Cal.Rptr. 424, 384 P.2d 16], on the ground that the purpose of the right to counsel in pretrial stages is primarily to insure early representation and adequate preparation for trial, and should not be construed to hinder legitimate police investigation when no substantial right of the accused is at stake. ▇ Since the privilege against self-incrimination does not exempt the accused from appearing for the purpose of identification, no substantial right is infringed by the show-up. The principle of the *Lopez* case has not been impaired by *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]. ▇ Although requiring a defendant to appear in a show-up after his indictment cannot be considered a mere investigatory procedure, the defendant is not prejudiced by the absence of counsel so long as the show-up is not designed to elicit information from him or impair his privilege against self-incrimination. The defendant is required to do no more at a show-up than he would have to do at trial, and the prosecution may properly use such a procedure to select witnesses and prepare its case. ''[A]bsent the privilege against self-incrimination or other privileges provided by law, the defendant in a criminal case has no valid interest in denying the prosecution access to evidence that can throw light on issues in the case.'' (*Jones* v. *Superior Court,* 58 Cal.2d 56, 59 [22 Cal.Rptr. 879, 372 P.2d 919, 96 A.L.R.2d 1213].)

▇ Gilbert contends that counsel is necessary at the show-up to observe whether the proceedings are fairly conducted. Counsel can effectively obtain such information, however, by pretrial discovery of prosecution witnesses and by cross-examination on the issue of the procedure employed during the show-up.

Gilbert contends that the trial court erroneously admitted into evidence testimony that he was armed with a concealed deadly weapon when he was arrested. We agree.

▇ The weapon found in Gilbert's possession when he was arrested was not identified as the one used in the robbery. (Cf. *People* v. *Riser,* 47 Cal.2d 566, 577 [305 P.2d 1]; Pen. Code, § 12022.) Such evidence could therefore be properly admitted only upon the issue of the minimum penalty. (Pen. Code, §§ 3024, 969c, 1158a.) Penal Code section 3024 provides for increased minimum penalties when the defendant has in his possession a concealed deadly weapon upon arrest. ▇ When the defendant is so charged under sec-

tion 969c and pleads not guilty, the jury must determine whether he was armed as charged. (Pen. Code, § 1158a.) When the defendant is willing to stipulate to being armed at arrest for the purpose of the penalty, however, as in the present case, no purpose is served by admitting evidence that the defendant was so armed. (Cf. Pen. Code, § 1025.) Moreover, even if the defendant denies being armed upon arrest, the jury should be instructed that evidence that the defendant was armed when arrested should not be considered as tending to prove his guilt. ■■■ Evidence that a weapon was found in the defendant's possession ''tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons.'' (*People* v. *Riser*, 47 Cal.2d 566, 577 [305 P.2d 1].) The error in admitting testimony that Gilbert was armed at arrest, however, was not prejudicial. (Cal.Const., art. VI, § 4½.)

■■■ Gilbert contends that the trial court erred in admitting evidence that he was arrested in Philadelphia, on the ground that the time and place of his arrest were too remote to prove flight. There was other more cogent evidence of flight, however, and Gilbert was not prejudiced by the evidence that he was arrested in Philadelphia.

Gilbert contends that the trial court improperly refused to give an alibi instruction. ■■■ An alibi consists of evidence that the defendant was not at the scene of the crime when it was committed and did not otherwise participate in its commission. ■■■ No evidence was introduced to show that Gilbert was somewhere else at the time of the robbery.

The robbery occurred about 10:45 a.m. on January 3, 1964. King testified that it took about 45 minutes to drive from Alhambra to Gilbert's apartment. The manager of the apartment house testified that Gilbert asked her for a key between 11 a.m. and 12 noon. Upon cross-examination, the manager said that she thought it was closer to 12 than to 11 when Gilbert asked her for the key. She admitted, however, that she previously told the F.B.I. that Gilbert asked her for a key sometime between 11 a.m. and 11:30 a.m. Such evidence did not warrant an alibi instruction. The manager's admission upon cross-examination that her testimony varied somewhat from the statement she previously gave to the F.B.I. did not tend to establish that Gilbert was somewhere else when the robbery occurred. It merely cast some doubt on the accuracy of the manager's testimony. Accordingly, the trial court properly refused an alibi instruction.

Gilbert contends that the trial court committed prejudicial error in refusing to instruct the jury on the issue of kidnaping with bodily harm. Section 209 of the Penal Code provides that when the person kidnaped suffers bodily harm the penalty shall be either death or life imprisonment without possibility of parole. Thus, if there was evidence of bodily harm and the jury had been instructed thereon, it would not have been limited to choosing between the death penalty and life imprisonment, but would also have been able to fix the penalty at life imprisonment without possibility of parole. (Cf. *People* v. *Seiterle,* 56 Cal.2d 320 [14 Cal.Rptr. 681, 363 P.2d 913].)

The trial court did not err, however, in refusing to give Gilbert's requested instruction on bodily harm, since there was no evidence to support such an instruction. The victim testified that the grip on her arm was so firm that she "felt the impressions on that arm for sometime," and that she was pushed toward the door. Although she fell down on the sidewalk, she was not sure whether she was pushed down, and there was no evidence that she suffered any injuries in falling. Such trivial injury is not sufficient to constitute bodily harm within the meaning of section 209. In *People* v. *Jackson,* 44 Cal.2d 511, 516-517 [282 P.2d 898], we held that the victim of a kidnaping suffered no bodily harm as a matter of law, although he was pushed into a sitting position on a couch and his wrists and ankles were chained so as to impair the circulation of blood and make some marks on his wrists.

Gilbert contends, however, that "any touching of the person of another against his will with physical force in an intentional, hostile and aggravated manner, or the projecting of such force against his person" constitutes bodily harm within the meaning of section 209. (See *People* v. *Tanner,* 3 Cal.2d 279, 297 [44 P.2d 324]; *People* v. *Britton,* 6 Cal.2d 1, 3 [56 P.2d 494]; *People* v. *Brown,* 29 Cal.2d 555, 559 [176 P.2d 929]; *People* v. *Chessman,* 38 Cal.2d 166, 185 [238 P.2d 1001].) We rejected this definition in the *Jackson* case, however, and pointed out that in the *Tanner* case and the cases following it the kidnaping victim suffered serious bodily injury.

Finally, there is no merit in Gilbert's contention that the trial court improperly excused jurors for cause who stated upon *voir dire* examination that they would have been able fairly to adjudicate guilt even though they were conscientiously opposed to capital punishment. He asserts that such

jurors should have been allowed to serve at the trial on the issue of guilt and a new jury impaneled if necessary for the trial on the issue of penalty.

In *People* v. *Riser,* 47 Cal.2d 566, 573-576 [305 P.2d 1], we held that it is improper to permit such jurors to serve even though their exclusion is not compelled by a literal reading of Penal Code section 1074, subdivision 8.[8] Moreover, after our decision in the *Riser* case, the Legislature adopted section 190.1, which provides for a separate penalty trial and states that at the trial on the issue of penalty "the trier of fact *shall be the same jury* [as on the issue of guilt] unless, for good cause shown, the court discharges the jury . . . ." (Italics added.) Thus, in providing for a separate penalty trial, the Legislature expressed a preference for one jury qualified to act throughout the entire case.

Such legislative preference for the same jury at both trials deprives the defendant neither of due process nor of the right to an impartial jury. Since all of the evidence properly introduced at the trial on the issue of guilt is relevant in determining the penalty (Pen. Code, § 190.1), having the same jury avoids repetition of evidence and is thus not an arbitrary requirement. To exclude jurors opposed to the death penalty does not favor the prosecution over the defendant, for the defendant has the right to challenge for cause jurors who have a bias in favor of the death penalty even though they state that they are able to render an impartial verdict of guilt. (See *People* v. *Riser,* 47 Cal.2d 566, 575 [305 P.2d 1].)

The judgment as to King is reversed. The judgment as to Gilbert on count II is reversed. In all other respects the judgments as to Gilbert are affirmed.

Peters, J., Tobriner, J., Peek, J., and Burke, J., concurred.

MOSK, J.—I concur in affirming the judgments as to Gilbert and I concur in the reversal of count II as to both defendants under compulsion of *People* v. *Washington* (1965) 62 Cal.2d 777 [44 Cal.Rptr. 442, 402 P.2d 130]. I

---

[8]Section 1074, subdivision 8, provides that: "A challenge for implied bias may be taken for all or any of the following causes, and for no other. . . . 8. If the offense charged be punishable with death, the entertaining of such conscientious opinions *as would preclude his finding the defendant guilty* . . . ." (Italics added.)

dissent, however, from the reversal of the other judgments as to King.

On the ladder of culpability, King was undeniably several rungs below his codefendant Gilbert. This factor was considered by the jury in sparing his life while returning a verdict of death for Gilbert. However, neither a distinction between the extent of involvement of the two defendants nor the facts of this case justify reversing King's conviction.

Viewed in the light most favorable to the People, as it must be (*People* v. *Sweeney* (1960) 55 Cal.2d 27, 33 [9 Cal. Rptr. 793, 357 P.2d 1049]), the evidence does not support the view of the majority that the incriminating statements of King were obtained when "the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements" (*Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]; *People* v. *Dorado* (1965) 62 Cal.2d 338, 353 [42 Cal.Rptr. 169, 398 P.2d 361]).

The prosecution attempted to introduce into evidence statements made by both defendants. After extensive *voir dire* examination outside the presence of the jury, the trial judge thoughtfully reviewed the facts and the relevant law on confessions. Gilbert's extrajudicial statements were excluded. As to King, however, the court made a specific oral finding: "I think the record is straight. The Court has heard the evidence in this case and is of the opinion that this defendant did not request counsel; that he had no desire to have counsel at the time. That the first time that he knew that he became suspect in this case it was his desire to make a complete confession of his involvement in this offense, on his own volition, and that whatever statement he made, from evidence I heard, was completely voluntary on his part. . . . I am not yet prepared to say that a defendant that wants to 'spill his guts,' if I may use that term, and make a complete confession of a crime, that he cannot be permitted to do so unless whoever is questioning him goes out and gets him a lawyer."

Under well-settled rules of law, we are bound by the determination of the trial judge on questions of fact. The trial court found not merely that King did not ask for counsel, but that *he had no desire to have counsel* at the time of his confession. The evidence amply supports that conclusion.

The majority opinion refers to "a period of prolonged interrogation" after arrest and during the accusatory stage

as defined in *Dorado*. That description is superficially accurate, but it overlooks the significant backdrop to this drama.

The tragic crime involved here was committed on January 3, 1964. From January 5 on, King knew that he was a suspect, and indeed he had been interviewed by the police three times. He had more than a month in which to obtain advice of counsel if he had so desired and having suffered two prior convictions of a felony, he could not have been unaware of the need for and the right to legal representation. Instead, however, he brooded about making a clean breast of his involvement, and in fact on one occasion he started for the police station with that in mind but lost his nerve en route. This background makes completely comprehensible his subsequent conduct when, on February 11, he was brought from San Gabriel, where he was in custody on another matter, to the Alhambra police department, where he was placed under arrest on these charges and a process of booking began. During that process King asked Officer Ted Bennett what charges he faced, and the officer responded that he was being booked for two counts of murder, one count of robbery, and one count of kidnaping. Thereupon King became voluble and freely discussed his participation in the events involved herein. Officer Bennett did not undertake a process of interrogation, but on the contrary tried to discourage King from talking and instructed him to wait until later, for his conversation was interrupting the booking procedure. Nevertheless, King persisted and continued to discuss the case. The dialogue related in the footnote summarizes the event.[1]

---

[1] On *voir dire* examination at the trial, Officer Bennett made it abundantly clear that King's statements were voluntary and entirely unsolicited. In response to questions from the court, the officer testified as follows:

"THE COURT: You first took him to the booking officer that has charge of the booking, did you?

"THE WITNESS: Yes, sir.

"THE COURT: With reference to your taking him there, when did he start to talk about this case?

"THE WITNESS: As he was taken to the booking window, he asked what the charges were. I related the charges, and at that time he started relating his participation in it.

"THE COURT: Did you make some statement to him at that time about continuing with telling you about it until a later time or what?

"THE WITNESS: I asked him on several occasions, sir, not to relate it at that time, to wait until after he was booked, but he continued on.

"THE COURT: Now, were you there during the process of the booking?

"THE WITNESS: Yes, sir.

"THE COURT: And during all the time that he was being—the in-

The majority emphasizes that the statements introduced in evidence were not those made by King during the booking process but were those elicited during the subsequent period in the interrogation room. I do not consider this to be a significant distinction, for during this entire period King sought to relate his story and, indeed, could not be deterred from doing so. It is understandable that King would choose to volunteer statements regarding his participation in the crimes, since it was his purpose to cast the blame entirely on his codefendant Gilbert.[2] He undoubtedly considered it to his advantage to relate his version of events before his co-defendant talked. That he was so inclined is indicated not only by his conduct during the booking procedure but by his earlier start for the police station to confess, frustrated only by his loss of nerve. He stated several times that he could not sleep because he was troubled by his conscience, that he "wanted to see this guy [Gilbert] busted as much as you."

After several hours in the interrogation room, during which King related his version of events, he was asked to prepare a statement and sign it. He recited his story voluntarily and without interruption or interrogation. In fact, one witness described him as being as resolute as if he were dictating a novel.[3]

The first time the evidence suggests any reluctance by King to continue his volunteered narration was his declination to sign the dictated statement. He then added an

---

formation was being taken by the booking officer, was he making statements with reference to this case?

"THE WITNESS: Yes, sir, he was.

"THE COURT: And this started as soon as you told him what he was going to be charged with, is that right?

"THE WITNESS: Yes.

"THE COURT: All right. Did he continue making this statement during the booking process?

"THE WITNESS: All through the process, sir."

[2] The eagerness of King to talk was deemed significant by his own counsel, who stressed it in closing argument to the jury: "You can also take into consideration the fact that after Mr. King's arrest he did try in all ways that he could to assist the Alhambra police. Now, maybe this assistance came late; maybe Mr. King was interested in self-preservation and wanted to keep from being tied into these particular offenses. But then he did cooperate, and I think that cooperation with the police indicates the possibility of rehabilitation as far as Mr. King is concerned."

[3] The following colloquy was from the testimony of the witness Luciano:

"Q. There were no instructions at all during this dictated statement?

"A. No interruptions whatsoever. He sat down and dictated like he was writing a novel."

appendage reading as follows: "I make this statement freely of my own will, however not being familiar with the laws I do not feel that I should sign this confession or make any tape recordings of the same until I have been advised to do so or not by an attorney. The officers involved did inform me prior to making this statement that it could and possibly would be used in court against me."

At the trial, King asserted he had expressed a desire to phone his girl friend to request her to obtain counsel for him. But on cross-examination he admitted that she would have been unavailable during working hours. Furthermore, King admitted to a witness outside the courtroom during preliminary proceedings that he had not asked for a phone call to contact an attorney, but had read of a recent Supreme Court decision in the newspaper about asking for an attorney, and "you can't blame a guy for trying." In any event, we are bound by the factual determination of the trial court that he neither sought nor desired counsel during this period.

The majority, by reversing King's conviction merely because *Dorado* ritual was not recited, apply a parochial approach to a relatively uncomplicated factual situation. The police officers could not have given legal advice to King *before* he blurted out his incriminating statements at the booking office; it is evident that efforts to deter his narration were unavailing. And it is wholly unrealistic, as well as futile, to require the police to advise a suspect of his right to counsel *after* he, of his own volition and without urging or prompting, takes the initiative to confess. It appears to be of little consequence that in the instant case King's unsolicited confession began during the booking process and continued in an interrogation room. The total circumstances are not as neatly divisible as the majority opinion chooses to make them. *People* v. *Jacobson* (1965) *ante,* p. 319 [46 Cal.Rptr. 515, 405 P.2d 555], and *People* v. *Cotter* (1965) *ante,* p. 386 [46 Cal.Rptr. 622, 405 P.2d 862], two cases involving multiple confessions cited by the majority, are inapposite. In both cases the defendants confessed several times during the investigatory stage, later were brought to the police station where they were interrogated and again confessed. The earlier and later events were clearly distinct as to time, location and circumstances. Here, King's incriminatory statement resulted from one continuous process, all of it the product of his contrite frame of mind. The record is utterly devoid of evidence suggesting he was imposed upon, coerced, persuaded or in-

duced to relate his criminal experience in any manner other than his uninhibited inclination dictated.

The evidence, including King's statement, amply supports his conviction. Therefore, except as to count II, I would affirm the King judgments.

McComb, J., concurred.

The petition of appellant Gilbert for a rehearing was denied February 9, 1966.