[Crim. No. 16874. Second Dist., Div. Four. May 28, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
JESSIE SAMUEL MYERS, Defendant and Appellant.

## COUNSEL

Louis G. Atlee, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Richard W. Bakke, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**FILES, P. J.**—After a jury trial defendant was convicted of first degree robbery (Pen. Code, § 211) and receiving stolen property (Pen. Code, § 496). He is appealing from the judgment. The notice of appeal also refers to "the denial of the 1538.5 motion" which is not an appealable order (see Pen. Code, § 1237).

There is no contention that the evidence was insufficient. The robbery victim identified defendant, and some of the victim's property was found in defendant's apartment. The search of defendant's apartment also disclosed a checkbook which had been taken from the victim of another robbery. This checkbook was the basis of the conviction for receiving.

Defendant's contention here is that the articles found in his apartment were inadmissible upon the ground they were taken by an illegal search. Prior to trial defendant moved, under Penal Code section 1538.5, for the suppression of these articles. After hearing the evidence the court denied the motion.

The evidence tending to support the ruling of the trial court includes the following:

During the evening of January 21, 1969, Officer Beasley, of the Los Angeles Police Department robbery detail, and his partner went to the apartment occupied by defendant and R. L. Foster. The officers had no warrant. Their purpose was to arrest defendant and Foster, who had been accused of a kidnap-robbery and rape. Officer Beasley had talked with the rape victim and had observed her bruises.

At the apartment house the officers first called upon the manager, who accompanied the officers to defendant's apartment and opened the door for them with her key. Before entering, Officer Beasley did not know whether or not the occupants were inside. After he entered and found no one there, he sat in a chair behind the door to wait.

The officer's testimony includes this:

"Q. Did you have some reason for waiting in—hidden in that manner?

"A. Yes, sir.

"Q. What was that?

"A. Based on the injuries that the rape victim had claimed, the injuries that I observed to her person, the fact that the defendant supposedly had a gun, I wanted every possible advantage when he came through that door."

When Foster arrived, Officer Beasley arrested him and then made a search of the apartment, in the course of which he found the articles which were used against defendant in this case.

■ The search went beyond the scope allowed by the recent opinion in *Chimel* v. *California* (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], but those new limitations do not apply to searches made prior to the date of the *Chimel* decision. (*People* v. *Edwards* (1969) 71 Cal.2d 1096 [80 Cal.Rptr. 633, 458 P.2d 713].) Under the law then applicable, the search was a proper incident of Foster's arrest, if that arrest was legal.

Defendant conceded in the trial court that Officer Beasley had reasonable cause to arrest Foster without a warrant.

Defendant's attack on the legality of the arrest is based upon two theories: (1) The arrest inside the apartment was only a pretext designed to afford an opportunity to seize evidence which the police had located by a prior illegal search; and (2) Officer Beasley entered the apartment without first having demanded admittance and explained his purpose in compliance with Penal Code section 844.

In support of his first contention defendant produced the testimony of the apartment house manager. She testified that between 6 and 7 p.m. on the evening of Foster's arrest, about an hour before Officer Beasley's arrival, six uniformed officers came to the apartment, found the door open, entered and made a search, looking under the mattress, in the cupboards and in the drawers. She said those officers found some papers which they carried away with them.

On this subject Officer Beasley's testimony was as follows:

"Q. Did you have any knowledge of any police officers being to that apartment ahead of you?

"A. I was aware that officers had been there, yes.

"Q. Were you aware that they had gone in and made any search?

"A. No, sir."

■ On the factual issues, including the credibility of witnesses, we must assume in favor of the trial court's decision all inferences which could reasonably be drawn from the evidence. ■ Upon this record, the trial court could reasonably find that Beasley came to the apartment in good faith to arrest two men wanted for a rape-robbery kidnaping, and that he had no knowledge that other officers had been inside previously. It was reasonable for Beasley to expect that one or both subjects might be found in the apartment in the evening. Furthermore, the trial court was not required to believe, on this record, that the uniformed officers had discovered the articles which were later used against defendant, or, if the uniformed officers had seen them, that they had attached any significance to them. The factual basis of defendant's claim of "pretext" therefore disappears with the trial court's adverse finding of the facts.

■ The officer's failure to comply with Penal Code section 844 is a problem here only because the prosecutor neglected to ask the witness about his state of mind immediately before entering. In the absence of direct evidence, it is a permissible inference that his state of mind then was the same as that which he described as his reason for wanting to wait behind the door when he found the apartment empty. Officer Beasley had come to arrest men who had proved their propensity for violence, who were believed to be armed, and who were wanted for an offense carrying a possible death penalty (Pen. Code, § 209). Speaking of his reason for waiting inside, behind the door, Officer Beasley said, "I wanted every possible advantage."

The rule is well established that noncompliance with section 844 may be excused when the officer acts on a reasonable and good faith belief that compliance would increase his peril. (See *People* v. *Gilbert* (1965) 63 Cal.2d 690, 706 [47 Cal.Rptr. 909, 408 P.2d 365][1] (officer used manager's key); *People* v. *Smith* (1966) 63 Cal.2d 779, 797 [48 Cal.Rptr. 382, 409 P.2d 222] (officer crawled through window to avoid a dangerous confrontation).)

In the case at bench the evidence supports the trial court's finding that the officer chose to enter silently, with the aid of the manager, because he reasonably believed that this would be less dangerous than to announce himself.

Once the officer had made a lawful entry, and found the wanted men

[1]Vacated and remanded on another point *sub nom. Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1957].

were absent, there was no constitutional compulsion for him to withdraw and try to make the arrest by some means which he reasonably believed would be more dangerous. There was no further or different invasion of anyone's privacy from that moment until Foster entered and was lawfully arrested.

The judgment is affirmed. The attempted appeal from the order is dismissed.

Jefferson, J., concurred.

**KINGSLEY, J.**—I dissent. I agree with my colleagues that the legality or illegality of the first search of the apartment is immaterial. Nothing in the record shows either that anything then found contributed to defendant's conviction or that Officer Beasley and his partner knew that the first search had occurred.

However, I feel that the second search was illegal. Since evidence thereby secured was the sole evidence to support the verdict on count III, and contributed to the proof on count I, its illegality demands a reversal.

The crime report and the interrogation with the victim of the rape-robbery-kidnaping charge gave him reasonable cause to arrest both defendant and his roommate. And I must accept, as the trial court did, the fact that he believed that one or both suspects might be in the apartment. But the record is silent as to any attempt to comply with section 844, nor does the officer's testimony contain any claim that, *at the time of entry,* he regarded himself in danger. He simply talked the manager into giving a consent to enter which she had no right to give and, acting on that consent, entered. In short, if the officer did not believe that at least one suspect was in the apartment, he had no right to enter at all; if he believed someone was present, the record shows no grounds for the total noncompliance with section 844—a matter as to which the People had the burden of proof.

When the officer was asked about the *entry,* as distinguished from the *waiting,* he was totally silent as to any fear of danger. The testimony giving the greatest detail about the entry itself was as follows:

"THE COURT: . . . You said that the landlady accompanied you to the apartment?

"THE WITNESS [Officer Beasley]: Yes, your Honor. She walked through the hallway with me and my partner. She did so to point out the defendant's apartment. He had moved from the location that I previously was aware of.

"THE COURT: Was the door locked?

"THE WITNESS: To the best of my recollection, the door was pulled to. And it required a key. However, I did see some lock damage.

"THE COURT: Well, how did you actually get into the apartment? How did you physically get into the apartment? Was the door ajar?

"THE WITNESS: No. To the best of my recollection, the landlady opened the door.

"THE COURT: She opened the door for you?

"THE WITNESS: Yes, sir."

As I have said above, I must accept the trial court's implied finding that the officer actually believed that either defendant or his roommate were in the apartment. But, if he did so believe, the mode of entry is not that to be expected where the officer reasonably anticipates that his entry will be met with armed resistance. An officer who believes that an armed and violent man awaits him inside an apartment does not stand outside, engaging in conversation with a landlady, and then have *her* use a key to open the door. Nothing in this record suggests that the officer was guilty of using the landlady as a cat's-paw to draw anticipated gunfire away from him. We cannot ascribe such conduct to him. It follows that the entry was illegal and the fruits of that entry were inadmissible.

The People argue that the illegality of the entry played no part in the ultimate arrest and conviction. I disagree. They argue that the officer could have waited, outside the apartment, and arrested the roommate as he approached and that the entry, and the waiting inside merely made easier (and possibly safer) an arrest already foredoomed to take place. But it is not the arrest of the roommate that is here questioned, but the search that followed. An arrest outside the apartment would not have justified a search of the apartment; but, by arresting the roommate inside the apartment, the officer had a basis for a search of the apartment, and that search not only led to identifying defendant as a participant in the crimes herein involved, but produced evidence introduced against him at the trial. The illegal entry, thus, was a direct cause of the damaging search and the product of that search could not validly be used against him. The motion to suppress should have been granted.

Appellant's petition for a hearing by the Supreme Court was denied July 29, 1970. Peters, J., and Tobriner, J., were of the opinion that the petition should be granted.