Filed 7/24/13  P. v. Gallardo CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ARTHUR KENNETH GALLARDO III,<br><br>  Defendant and Appellant. | G045875<br><br>(Super. Ct. No. 09NF0020)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Patrick Donahue, Judge.  Affirmed.

Tonja R. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lilia E. Garcia, William M. Wood and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury found defendant Arthur Kenneth Gallardo III guilty of first degree murder as charged in count one of the information. The jury found it true defendant personally and intentionally discharged a firearm during the commission of count one, but not true that he committed count one for the benefit of a criminal street gang. The jury found defendant guilty of attempted murder of Police Officer Wardle as charged in count two and of Police Officer Bolden as charged in count three. With regard to counts two and three, the jury found it true he personally and intentionally discharged a firearm in committing those crimes, found it not true that he acted with willful premeditation and deliberation, and found it not true he committed counts two and three for the benefit of a criminal street gang. The jury also found defendant guilty of street terrorism as charged in count four. The court sentenced defendant to prison for 45 years to life.

Defendant raises several arguments, all of which we reject. We find sufficient evidence supports his convictions for first degree provocative act murder as well as two second degree attempted murders. We invoke the doctrine of invited error with regard to defendant's argument the court erred in not instructing the jury on the lesser crime of second degree provocative act murder. With regard to defendant's request that we review the trial court's in camera review of police personnel records, we did that, and we did find an apparent discrepancy. We deem any error as a result of that apparent discrepancy to be harmless. We affirm.

I

FACTS

Anthony Diaz, a police officer with the Fullerton Police Department, was working the night shift, from 5:30 in the evening until 6:00 the next morning on December 28 and 29, 2006. At around 2:41 a.m., he was dispatched to Harbor and Orangefair because of a report of "a potential DUI driver passed out in an intersection."

Two officers approached from opposite sides of the tan sedan they found at the intersection. Diaz described what he saw: "The driver had his head slumped over

2

kind of like his chin into his chest. He did not have a shirt on. And he had a bald head and several tattoos. [¶] Looking further into the car, I noticed there was a shotgun in between or on the right side of his leg where he was seated in the driver seat." Diaz continued his description: "The passenger was also passed out. His — he was leaning back a little bit more in his seat with his head, again, chin to chest. In his lap in between his left and right leg kind of near his groin area, barrel down, hammer up was a semiautomatic handgun."

The driver of the sedan was Edmundo Gomez. Defendant was the passenger. Diaz radioed what he found and requested additional units. When backup arrived, the tan sedan was surrounded and traffic in the area was blocked. All of the officers, except Wardle and Bolden, were behind and to the side of the sedan. Diaz said: "As everybody was set up, I put out a PA announcement identifying ourselves as the Fullerton Police Department." Both occupants of the vehicle lifted their heads. Diaz explained what happened next: ". . . I can see the passenger come up — come up with the semiautomatic handgun. And the reason I could see it so clearly was from the position I was standing and him seated in his lowered seat, it gave me a very good view of the gun coming up. And then he looked around and shot off six rounds into the front window of my initial police vehicle that was parked in front of his car and blocking the path." Diaz continued: "At the same time the driver accelerated on the gas, the vehicle surged forward, hit my police car. The driver then looked behind him putting [it] in reverse, again accelerated, hit Corporal Corbett's front end of his car, which is where we're at, and then again put it in drive and again was trying to surge forward and hit my car. This is all within seconds."

Jeff Corbett, a police officer with the City of Fullerton, was at the scene, and testified at trial. Along with Diaz, he approached the sedan while the two men were sleeping.

3

He told the jury what was planned: "Once we had their attention, we were going to call them out, one at a time, starting with the passenger; have them exit out of the vehicle and basically walk them back to our location, hands in the air. We eventually would have them go down to their knees, place their hands behind their back. We would detain them, walk them to the vehicle. Once they are out of plain view or out of sight in the vehicle, then we would continue to the driver. Same procedure would happen with the driver."

Corbett described what happened after Diaz made his announcement: "I could hear the car drive forward. It cannot go forward because Sergeant Diaz's vehicle is bumper to bumper. I then can hear the screeching sounds of the tires, the front tires screeching as if he is trying to continue to throttle through the police unit. As that's happening is when I also start to hear shots fired from the passenger. That then draws my attention from the driver, then to the passenger. [¶] As it draws my attention, I see the driver from the peripheral of my left put the car in reverse and is slamming into my car in reverse. I wouldn't call it slamming, because we have him boxed in. But it's pushing now my vehicle in reverse. The sounds of the tires again screeching. [¶] I see as what I recall the front passenger firing four to six rounds, is what I can recall. As he is firing those rounds, the driver then puts the vehicle in drive again and is trying to throttle through Sergeant Diaz's car again. As he is doing that, I see the front passenger then with his right hand — I can still see the gun with the mitten on his hand — spin to his left over towards his left shoulder with his arm extended out towards the front driver, but more spinning all the way around where he opens his chest completely with his arm extended. Now the gun is pointed at Officer Bolden and Officer Wardle. [¶] About that time, I feared that he was going to shoot Officer Wardle or Officer Bolden, or if not, continue to shoot and spin around all the way to the rear of where the other officers were, including myself. I then fired one shotgun round towards the front passenger, towards the rear seat, putting it towards the center of the seat area." It was at that point that

4

Corbett observed the driver "take his right hand off the steering wheel, reach down and grab the pistol grip of the shotgun with his left hand trailing behind his right hand."

Fullerton Police Officer Adrian Wardle, said that after the sedan backed into the police vehicle, she observed that the passenger "started to basically lower his weapon as he is looking around, looks over in my direction, where there was myself and an officer to my left, and starts to turn the weapon towards us." The following question was asked by the prosecutor and answered by Wardle:

Q: "And did you at that point, just before you opened fire, did you believe that this passenger was going to shoot at you?"

A: "Yeah. Absolutely. I had no doubt in my mind."

Diaz announced over the loudspeaker, "Stop, Stop." The passenger turned toward the police officers who were on Harbor Boulevard, Wardle and Bolden. Diaz said: "I believed he was going to shoot them." The officers fired back. The driver was motionless, and determined to be dead. The passenger was bleeding from several places.

Richard Fukumoto, M.D. was a forensic pathologist for the Orange County Sheriff-Coroner's Office in 2006. He received the body of Gomez on December 29, 2006. He testified the cause of Gomez's death was gunshot wounds, and that he had "14 different type wounds caused by — I believe some of them are entry wounds, some of them are exit wounds."

II

DISCUSSION

*Provocative Act Murder Doctrine*

Defendant first contends his "federal and state due process rights were violated because insufficient evidence supports his first degree murder conviction under the provocative act murder doctrine." Specifically, defendant says: "The prosecution presented insufficient evidence of first degree provocative act murder because it failed to prove [defendant] discharged a firearm from a vehicle intentionally at another person as

5

required by Penal Code section 189." The Attorney General argues: "The evidence that [defendant] turned to his left, pointed his gun, and fired it in the direction of the officers positioned off of the driver's side of [defendant's] car substantially established the elements of Penal Code section 189."

"All murder which is perpetrated by means of . . . discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree." (Pen. Code § 189.)

"In reviewing a sufficiency of evidence challenge, we view the evidence in the light most favorable to the verdict and determine whether *any* rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. [Citations.]" (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) In addressing challenges to the sufficiency of evidence, "the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.] The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]"' [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054.)

6

"A variation on the law of transferred intent, the provocative act doctrine holds the perpetrator of a violent crime vicariously liable for the killing of an accomplice by a third party, usually the intended victim or a police officer. [Citations.] Under the *felony-murder rule,* if an accomplice is killed by a crime victim and not by the defendant, the defendant cannot be held liable for the accomplice's death. [Citations.] The provocative act doctrine is not so limited. Under the provocative act doctrine, when the perpetrator of a crime maliciously commits an act that is likely to result in death, and the victim kills in reasonable response to that act, the perpetrator is guilty of murder. [Citations.] 'In such a case, the killing is attributable, not merely to the commission of a felony, but to the intentional act of the defendant or his accomplice committed with conscious disregard for life.' [Citation.]" (*People v. Gonzalez*, *supra*, 54 Cal.4th at pp. 654-655, fn. omitted.)

"A defendant can be liable for the unlawful killings of both the intended victims and any unintended victims. "'[T]here is no requirement of an unlawful intent to kill *an intended victim.* The law speaks in terms of an unlawful intent to kill *a* person, not *the* person *intended to be killed.*'" [Citations.]" (*People v. Concha* (2009) 47 Cal.4th 653, 660.) "When the defendant or his accomplice, with a conscious disregard for life, intentionally commits an act that is likely to cause death, and his victim or a police officer kills in reasonable response to such act, the defendant is guilty of murder. In such a case, the killing is attributable, not merely to the commission of a felony, but to the intentional act of the defendant or his accomplice committed with conscious disregard for life. Thus, the victim's self-defensive killing or the police officer's killing in the performance of his duty cannot be considered an independent intervening cause for which the defendant is not liable, for it is a reasonable response to the dilemma thrust upon the victim or the policeman by the intentional act of the defendant or his accomplice." (*People v. Gilbert* (1965) 63 Cal.2d 690, 704-705.)

"To summarize, a defendant is liable for murder when the actus reus and mens rea elements of murder are satisfied. The defendant or an accomplice must proximately cause an unlawful death, and the defendant must personally act with malice. Once liability for murder is established in a provocative act murder case or in any other murder case, the degree of murder liability is determined by examining the defendant's personal mens rea and applying [Penal Code] section 189. Where the individual defendant personally intends to kill and acts with that intent willfully, deliberately, and with premeditation, the defendant may be liable for first degree murder for each unlawful killing proximately caused by his or her acts, including a provocative act murder. Where malice is implied from the defendant's conduct or where the defendant did not personally act willfully, deliberately, and with premeditation, the defendant cannot be held liable for first degree murder." (*People v. Concha*, *supra*, 47 Cal.4th at pp. 663-664.)

In the instant case, instead of following instructions from police, defendant discharged several rounds with his semiautomatic weapon from a motor vehicle, and then turned his body and pointed his weapon directly toward two police officers. Police responded by returning fire, and Gomez was shot and killed by police. Under these circumstances, we must conclude sufficient evidence supports defendant's first degree murder conviction under the provocative act murder doctrine.

*Second Degree Provocative Act Murder*

Defendant next argues the trial court erred when it failed to give a sua sponte instruction for "the lesser included offense of second degree provocative act murder." The Attorney General asks that we apply the invited error doctrine.

When jury instructions were being discussed by court and counsel outside the presence of the jury, the court summarized the theory of the case: "And the People are alleging that this is a first degree provocative act murder based on the discharging of a

firearm from a motor vehicle intentionally at another person outside of the vehicle with the intent to inflict death, and the defendant intentionally did a provocative act."

The following conversation then took place between court and counsel when instructions were being discussed:

The court: "And my reading of these cases is that the only way you get to first degree murder and provocative act is if it's a violation of one of the crimes listed in Penal Code section 189. [¶] Ms. Crommett, am I right about that?"

The prosecutor: "I believe so, yes."

The court: "I think so too. [¶] And, Mr. Bank, how about you?"

Defense counsel: "Yeah. I agree with that, your Honor."

There was more discussion between court and counsel about the law. Then the following was said:

The court: "The People want to proceed on a first degree murder theory and really do not want a second degree murder. [¶] Is that correct?"

The prosecutor: "That's correct."

The court: "Okay. Mr. Bank, I don't think you're objecting too much to that, are you?"

Defense counsel: "I'll just submit, your Honor."

The court: "Okay. Because basically what this does is it makes it an all-or-nothing type of case. And I don't know — I'm not sure how you get to second degree murder on this. [¶] So the instruction as it's in the package is what we decided. And it describes what you need to find for first degree, but it doesn't give the jury the option of going to a second degree murder on this. [¶] In addition, we talked about lesser includeds. In many murder cases, there's voluntary manslaughter, usually based on an honest but unreasonable belief in self-defense and also on the heat of passion. But I don't see any way of — based on the facts of this case, I don't believe there's sufficient

9

evidence to give any lessers. [¶] And, Mr. Bank, I think you've discussed with your client that you are not — you don't want lesser includeds anyway."

Defense counsel: "We're not asking for any lesser includeds, your Honor."

The court: "You talked to Mr. Gallardo about that?"

Defense counsel: "Yes, I did."

The court: "Mr. Gallardo, I'm going to ask you personally. That's okay with you that we do not give the voluntary manslaughter instructions or the involuntary manslaughter instructions?"

Defendant: "Yes, sir."

Further discussions took place, and then the court asked defense counsel whether he wanted any instructions modified, and defense counsel responded: "Not at this time, your Honor." The court then asked, "And any others that you are requesting?" Defense counsel responded, "No, your Honor."

Four days later, the court brought up the subject once again:

The court: "So what we're going to be doing is we're — and I did some more reading on this and I think it's okay to do it this way. [¶] But the court read *Concha*, . . . And, you know, what we're telling the jurors is that basically this is a first degree murder or nothing. That's the way we're instructing the jury. We're using the underlying intentionally to inflict death basically as the underlying crime. [¶] So we're telling the jurors this is first degree murder all the way. And I believe that's the way that both counsel wish this to be done."

Defense counsel: "Yeah. Yes, your Honor."

The prosecutor: "Yes."

The court: ". . . It's really an all-or-nothing deal we're doing here. It's either first degree murder or a not guilty; right?"

Defense counsel: "That's right, your Honor."

10

In his final argument, defense counsel argued: "He never discharged the firearm at another person." "Why do you think this Kelly Thomas thing has generated such a response? It's because people want to know what a police or multiple police officers saw that made them think they had to use lethal force against an unarmed 37-year-old schizophrenic homeless person. That's what the people want to know." From this argument, it appears defense counsel was tactically attempting to persuade the jury that Fullerton police did not require a provocative act before shooting someone.

At another point during final argument, defense counsel told the jury Gomez woke up first. He also stated: "It is illogical to think that Mr. Gomez would still be alive but for Mr. Gallardo. The officer who shot Gomez shot him because of Mr. Gomez's conduct. That's why he is fatally shot in the back of the head." From this argument, it appears defense counsel was tactically attempting to persuade the jury that it was the decedent, and not defendant, who provoked the police to shoot and kill decedent.

In an apparent attempt to have the jury conclude defendant could not see the officers outside the vehicle, defense counsel also argued: "When you heard how serious he is visually disabled, that didn't play some role in his ability to perceive his surroundings? Is it justification for his decision? No. That's felony reckless discharge of a firearm. You can't unsafely fire a gun. But you just don't jump to the inference that now she has proven beyond a reasonable doubt that he had the intent to kill."

At another point during argument, defense counsel told the jury the crime was something less than murder when he stated: "Was it a felonious decision to shoot recklessly, straight ahead? Yes, it was. Unfortunately, he is not charged with felony discharge of a firearm. He is charged with murder and these attempted murder charges."

"[A] trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) "[A] defendant may not invoke a trial court's failure to instruct on a lesser included offense as a basis on which to reverse a conviction

11

when, for tactical reasons, the defendant persuades a trial court not to instruct on a lesser included offense supported by the evidence. [Citations.] In that situation, the doctrine of invited error bars the defendant from challenging on appeal the trial court's failure to give the instruction." (*People v. Barton* (1995) 12 Cal.4th 186, 198.) For the invited error doctrine to be applicable to the giving of an instruction, "the record must show only that counsel made a conscious, deliberate tactical choice between having the instruction and not having it." (*People v. Cooper* (1991) 53 Cal.3d 771, 831.)

The record in this case is sufficient to resolve with confidence the question of whether counsel invited the court to err. On several occasions, the court brought up the topic of instructions on lesser included crimes. It is clear that both counsel and defendant were fully aware the jury would not be given any lesser options. It is also clear the all-or-nothing alternatives were exactly what the defense wanted. Its tactical reasons for inviting the court to do exactly what it did is obvious from defense counsel's final argument. Under the circumstances we find in this record, we conclude defendant is barred from challenging on appeal the trial court's failure to give instructions on lesser crimes.

Nonetheless, had defendant not invited the alleged error, he cannot show prejudice because, based on the evidence presented at trial, he would not have obtained a different result. "[T]he failure to instruct sua sponte on a lesser included offense in a noncapital case is, at most, an error of California law alone, and is thus subject only to state standards of reversibility. We further determine, in line with recent authority, that such misdirection of the jury is not subject to reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome. [Citations.]" (*People v. Breverman, supra,* 19 Cal.4th 142 at p. 165.) In light of the evidence here, we conclude it is not reasonably probable defendant would have obtained a more favorable result if instructions on second degree implied malice provocative act murder had been given.

12

*Sufficiency of Evidence for Attempted Murder*

Defendant next contends his due process rights were violated because insufficient evidence supports his convictions for attempted murder. The Attorney General argues "the evidence showed that after [defendant] fired his gun straight through the windshield, he turned to his left and fired a shot at Officers Bolden and Wardle. Officer Diaz testified that [defendant] fired four to six shots forward and then turned to the left in the direction of Officers Bolden and Wardle who were positioned off the driver's side of the vehicle on Harbor Boulevard."

"Attempted murder requires the specific intent to kill and the commission of a direct, but ineffectual act toward accomplishing the intended killing. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 177-178.) "'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions. [Citation.]'" (*People v. Smith* (2005) 37 Cal.4th 733, 741.) In *Smith,* there were also two victims. The defendant fired a bullet directly into a car from a distance of one car length, knowing the car was occupied by a woman and a baby. In holding sufficient evidence supported a conviction for attempted murder, the Supreme Court noted the jury inferred "that defendant acted with intent to kill *both* victims when he fired off a single round at them from close range, each of whom was directly in his line of fire." (*Id.* at p. 743.)

From the circumstances we find in this record, we conclude defendant's attempted murder convictions are supported by substantial evidence. Accordingly, his right to due process was not violated.

*Independent Review of Pitchess Materials*

Defendant requests this court to independently review the materials pertaining to the hearing held pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d

13

531.  The Attorney General states that, while defendant has not demonstrated an abuse of discretion by the trial court, such a review is appropriate.

In *Pitchess v. Superior Court*, *supra*, 11 Cal.3d 531, the California Supreme Court held a criminal defendant charged with battery on a number of sheriff deputies could, upon a proper showing, discover complaints of excessive force located in a deputy's personnel file.  (*Id.* at p. 534, 538.)  The court stated the right of a criminally accused to discovery is founded on "the fundamental proposition that [an accused] is entitled to a fair trial and an intelligent defense in light of all relevant and reasonably accessible information.  [Citations.]"  (*Id.* at pp. 535-536.)  The Legislature subsequently codified the procedure for litigating what has become known as *Pitchess* motions.  (Evid. Code, § 1043 et seq.)  These code sections were not only intended to codify the Supreme Court's decision in *Pitchess* but also to "curtail record shredding and discovery abuses that allegedly occurred in the wake of the *Pitchess* decision.  [Citation.]"  (*Haggerty v. Superior Court* (2004) 117 Cal.App.4th 1079, 1085.)

Penal Code section 832.5 requires law enforcement departments to investigate complaints against their personnel.  (Pen. Code, § 832.5, subd. (a)(1).)  The complaints and the reports of the resulting investigations must be maintained in either the officer's personnel file or such other files as designated by the officer's agency.  (Pen. Code, § 832.5, subd. (b).)  Records maintained pursuant to Penal Code section 832.5 "are confidential and shall not be disclosed in any criminal or civil proceeding *except* by discovery pursuant to Sections 1043 and 1046 of the Evidence Code."  (Pen. Code, § 832.7, subd. (a), italics added.)

The Evidence Code provides a limited right to discovery of an officer's personnel file maintained pursuant to Penal Code section 832.5.  The accused is entitled to discover relevant information or documents in the officer's personnel file on a showing of good cause.  (*People v. Gaines* (2009) 46 Cal.4th 172, 176; Evid. Code, § 1043, subd. (b)(1).)  In order to establish good cause, the defense must submit an affidavit in support

14

of a written motion for discovery.  The affidavit, which may be filed on information and belief, need only demonstrate the materiality of the information sought to the subject matter of the pending case and state upon reasonable belief that the law enforcement agency has the information or documents sought.  (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019; *City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 84.)

"A showing of 'good cause' exists if the defendant demonstrates both (1) a 'specific factual scenario' that establishes a 'plausible factual foundation' for the allegations of officer misconduct [citations], and (2) that the misconduct would (if credited) be material to the defense [citation]. . . .  Accordingly, defense counsel's supporting declaration must propose a defense and articulate how the requested discovery may be admissible as direct or impeachment evidence in support of the proposed defense, or how the requested discovery may lead to such evidence.  [Citation.]  Thus, a defendant meets the materiality element by showing (1) a logical connection between the charges and the proposed defense; (2) the requested discovery is factually specific and tailored to support the claim of officer misconduct; (3) the requested discovery supports the proposed defense or is likely to lead to information that will do so; and (4) the requested discovery is potentially admissible at trial.  [Citation.]" (*Giovanni B. v. Superior Court* (2007) 152 Cal.App.4th 312, 319.)

In the instant case, defendant's counsel filed a motion for discovery of peace officer personnel records for 10 officers.  The court conducted an in camera hearing after previously finding "a plausible scenario as set forth in the defense affidavit."  The court swore in the custodians of the records of the 10 officers.  The court inquired of the custodians how a complaint about an officer is recorded and maintained, and was assured all complaints, whether by citizens or other officers, would be contained in the records produced by the custodians.

15

The court went through the records of each of the 10 officers, one by one. After reviewing the records, the court ordered production of information pertaining to several complaining witnesses.

After the court ordered the prosecutor to produce the records designated above, the City of Fullerton sought extraordinary relief by way of a writ of mandate in this court. The Court of Appeal granted a temporary stay. A few weeks later, the Court of Appeal dissolved the stay and denied the writ petition. Ten days later, the California Supreme Court denied a request for a stay and petition for review.

Following the city's unsuccessful petitions for writ relief, the trial court signed an order regarding the release of identifying information of complainants and witnesses to various incidents. The order also described the permissible uses of the released information.

In comparing the sealed reporter's transcript of the court's March 18, 2011, in camera hearing with the attorney for the city and the custodians of records with the court's April 22, 2011 signed order, we note an apparent discrepancy.

We emphasize the importance of a sufficient record on appeal. In this case, the trial court's records are not sufficient for us to determine exactly what the trial court ordered produced with regard to one officer; it is for that reason we refer to our finding as an "apparent discrepancy." We request the trial court to take more care in preserving a record for appeal in future in camera hearings. As recently stated by the California Supreme Court, "'we must be presented with an adequate record to review on appeal.'" (*People v. Williams* (2013) 56 Cal.4th 630, 713.)

We recognize that neither defendant nor his counsel were present for the in camera hearing and are not in a position to now argue that the apparent discrepancy we find in the record is prejudicial. Nonetheless, in reviewing the testimony at trial, we see that both Corbett and Wardle described the circumstances leading up to the police shooting at defendant and Gomez. There were no complaints in the personnel files of

16

either of those officers.  Nor are either of those officers involved in any way with what appears to be a discrepancy between what was ordered during the in camera hearing and what was ordered in the written court order more than a month later.

Under the circumstances we find in this record, we conclude any error as a result of the apparent discrepancy is harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24, and also harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836, as the result would have been the same for defendant had the error not been committed.

## III

## DISPOSITION

The judgment is affirmed.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


IKOLA, J.

17