Filed 5/13/24  In re F.L. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re F.L., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | E078804 |
| Plaintiff and Respondent, | (Super. Ct. No. INJ2100012) |
| v. | OPINION |
| F.L., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Susanne S. Cho, Judge.

Affirmed.

Paul R. Kraus, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson, and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

While riding as a passenger in an SUV, defendant and appellant F.L., a minor, fired a gun at a moving car, a Toyota Yaris. A passenger in the Yaris returned fire and lethally shot the driver of the SUV, causing the SUV to career out of control and kill a pedestrian.

F.L. was charged with murder in a wardship petition filed with the juvenile court. F.L. appeals from the juvenile court's findings that he committed two counts of second degree, provocative act murder of the SUV driver and pedestrian (Pen. Code, § 187, subd. (a)[1]; counts 1 & 2); felony possession of a concealed firearm (§ 29610; count 5); and misdemeanor possession of ammunition (§ 29650; count 6). As to count 1, the court found true the allegation that F.L. personally discharged a firearm, proximately causing death (§§ 1192.7, subd. (c)(8), 12022.53, subd (d)). The court found not true the two counts of attempted murder of the Yaris driver and passenger (§§ 664, 187, subd. (a); counts 3 & 4). The court declared F.L. a ward of the court and committed him to the Pathways to Success program until the age of 25 or two years after his commitment date, whichever is later.

F.L. contends there was insufficient evidence to support the findings of two counts of provocative act murder. F.L. also contends he did not receive adequate notice of the underlying crimes the juvenile court relied on when finding true the provocative act murder allegations. Alternatively, F.L. argues that his attorney's failure to object to

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

2

notice constituted ineffective representation.  F.L. further argues that the juvenile court erred in excluding expert testimony on adolescent brain development.  We reject F.L.'s contentions and affirm the true findings on the provocative act murder allegations.

## II.

## FACTS AND PROCEDURAL BACKGROUND

On August 7, 2020, Jason Verdugo drove his green Chevrolet Blazer (SUV) to a Metro PCS store.  J.M. sat in the front passenger seat and F.L. sat in the back seat.  On the same day, B.B. picked up his brother, A.B., in a red Toyota Yaris.  They also drove to the Metro PCS store.  B.B. parked in front of the store and went inside, while A.B. waited in the front passenger seat.  B.B. noticed a group of young men in the store.  B.B. recognized one of them, J.M., from high school.  B.B. knew J.M. socialized with gang members.  Another one in the group, F.L., looked at B.B. up and down.  The group of men left the store before B.B.  When B.B. approached the Yaris, he saw the group of men standing by the SUV parked next to the driver's side of the Yaris.  F.L. stared at B.B., causing him to feel uncomfortable.

Meanwhile, while waiting in the Yaris, A.B. saw the group of three men leave the store.  One of them seemed to be "mad-dogging" or staring at him.  A.B. tried to ignore him.  The men stood by the driver's side of the Yaris.  A.B. noticed that, as B.B. approached the Yaris and got in, F.L. looked at him up and down and heard him say "'wassup,'" in an aggressive, challenging, confrontational tone.  B.B. ignored the comment, got in the car, and drove away, with A.B. in the front passenger seat.

3

When B.B. stopped the Yaris at a traffic light, a black vehicle stopped on the passenger side of the Yaris. B.B. noticed the SUV behind the black car. When the light turned green, the vehicles proceeded through the intersection. As the black car pulled ahead of the Yaris, the SUV accelerated past the Yaris on the passenger side. B.B. saw the rear driver's side window lower and F.L. stuck a gun out the window. B.B. yelled at A.B. to duck as F.L. fired the gun. B.B. and A.B. feared for their lives. B.B. believed they were being fired at by gang members. A.B. and B.B. continued to hear shots fired as the SUV pulled in front of the Yaris. B.B. removed a gun from the center console, gave it to A.B., and lowered the passenger side window. B.B. told A.B., "'Do it. Do it.'" When the juvenile court asked B.B. why he had a loaded gun in the car, B.B. responded, "2020 had the highest homicide rates in the valley," and "[e]verybody, even minors carry guns."

A.B. fired the gun at the SUV multiple times. A.B. testified he aimed the gun at the back left tire. An investigator testified A.B. and B.B. told him that A.B. was aiming at the SUV occupants' heads. At an intersection, B.B. turned left to get away from the SUV. Jason, the driver of the SUV, lost control of the SUV when he was lethally shot in the head during the exchange of gunfire. The SUV proceeded straight ahead through the intersection at 40 miles per hour, and then drifted onto the sidewalk and collided with a couple, Gabriela and her husband, who were walking on the sidewalk. Gabriela died of her injuries. F.L. and the other SUV passenger, J.M., fled from the SUV. Shortly thereafter the police detained J.M. and F.L. nearby.

Meanwhile, B.B. drove to his mother's home. B.B. and A.B. noticed the Yaris's right front fender had two bullet holes. They filled the holes and painted over the repair. The SUV also had a bullet strike mark on the driver's side headrest, a bullet hole in the passenger side headrest, a bullet strike mark to the driver's side rear fender, and shattered glass on the driver's side rear window.

B.B. asked a friend, A.M., to hold onto the gun because he did not "'want to get in trouble.'" B.B. did not want to tell the police about the shooting incident because he did not want to be a "snitch" and be killed. When A.M. was caught with the gun during a probation check, he told the police that he was not involved in the shooting incident but had information concerning it. A.M. admitted he got the gun from the brothers 30 minutes after the shooting. A.B. told him he knew the people in the SUV and did not like them. A.B. also told A.M. he was aiming at their heads when shooting at them. A.M. testified that B.B. and A.B. told him that the people in the SUV fired at them first, so A.B. fired back.

J.M. testified that, while at the Metro PCS store, an individual came in and "mad-dogged" him, Jason, and F.L. J.M. did not know if anyone was shooting from the Yaris because he was looking at his phone. He also did not know if F.L. fired a gun. J.M. said he did not notice anything until his cousin, Jason, was shot from behind. J.M. turned off the ignition, the steering wheel locked, and the SUV drove onto the sidewalk and crashed into a man and woman. The police contacted J.M. after the incident and he told them he was not involved. Jason's mother (J.M.'s aunt) testified that J.M. told her that F.L. fired a

5

gun during the incident and that the police would not find the gun. She said J.M. also told her he was not a rat and had lied to the police.

On January 13, 2021, F.L. was arrested and taken into custody. Deputies found a loaded pistol in his possession and ammunition, including a bullet that was the same type, but a different manufacturer, as the bullets found at the shooting scene.

III.

SUFFICIENCY OF EVIDENCE OF PROVOCATIVE ACT MURDER

F.L. contends there was insufficient evidence to support the juvenile court's finding he committed provocative act murder of Jason and Gabriela. He argues the juvenile court did not base its murder findings on any underlying alleged offenses committed by F.L. The only alleged underlying provocative act offenses were attempted murder of B.B. and A.B., which the juvenile court found not true. The People argue there was substantial evidence F.L. committed the intentional provocative act of shooting at the SUV, with conscious disregard for life, which proximately caused the death of the driver of the SUV and a pedestrian. We agree such evidence was sufficient to support the findings of provocative act murder.

A. *Standard of Review*

We apply the same standard of appellate review "in considering the sufficiency of the evidence in a juvenile proceeding as in reviewing the sufficiency of the evidence to support a criminal conviction.[] In either type of case, we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial

6

evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*In re Sylvester C.* (2006) 137 Cal.App.4th 601, 605, fn. omitted; see also *People v. Gonzalez* (2012) 54 Cal.4th 643, 653 (*Gonzalez*).)

B. *Law Applicable to Murder Findings Against F.L.*

A murder conviction requires "the commission of an act that causes death, done with the mental state of malice aforethought (malice). (§ 187.) Malice may be either express or implied. (§ 188.) Express malice is an intent to kill. [Citation.] Implied malice does not require an intent to kill. Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses. [Citation.]" (*Gonzalez*, *supra*, 54 Cal.4th at p. 653.)

There are two degrees of murder, first and second degree murder. "The degrees are distinguished by the mental state with which the killing is done. A person who kills unlawfully with implied malice is guilty of second degree murder. [Citation.] A person who kills unlawfully and intentionally is guilty of first degree murder if the intent to kill is formed after premeditation and deliberation. (§ 189; [citation].)" (*Gonzalez*, *supra*, 54 Cal.4th at p. 653.) Implied malice murder does not require an intent to kill. (*Ibid.*)

7

When someone other than the defendant kills during the commission or attempted commission of a crime, the defendant may be prosecuted for murder under the provocative act doctrine. (*Gonzalez*, *supra*, 54 Cal.4th at p. 654.) "'A provocative act murder case necessarily involves at least three people.'" (*Ibid*.) As explained in *People v. Cervantes* (2001) 26 Cal.4th 860, 867, "we have applied principles of implied malice murder to situations in which criminal defendants neither kill nor intend to kill, but cause a third party to kill in response to their life-threatening provocative acts. The provocative act murder doctrine was originally conceived as a form of implied malice murder, derived as an offshoot of the felony-murder rule."

"Under the provocative act doctrine, when the perpetrator of a crime maliciously commits an act that is likely to result in death, and the victim kills in reasonable response to that act, the perpetrator is guilty of murder. [Citation.] 'In such a case, the killing is attributable, not merely to the commission of a felony, but to the intentional act of the defendant . . . committed with conscious disregard for life.' [Citation.]" (*Gonzalez*, *supra*, 54 Cal.4th at pp. 654-655.) "[*T*]*he victim's self-defensive killing* or the police officer's killing in the performance of his duty *cannot be considered an independent intervening cause for which the defendant is not liable, for it is a reasonable response to* the dilemma thrust upon the victim or the policeman by *the intentional act of the defendant* or his accomplice. [Citations.]" (*People v. Gilbert* (1965) 63 Cal.2d 690, 704-705, italics added.)

8

"The provocative act murder doctrine has traditionally been invoked in cases in which the perpetrator of the underlying crime instigates a gun battle, either by firing first or by otherwise engaging in severe, life-threatening, and usually gun-wielding conduct, and the police, or a victim of the underlying crime, responds with privileged lethal force by shooting back and killing the perpetrator's accomplice or an innocent bystander. (See, e.g., [*People v.*] *Washington* [1965] 62 Cal.2d 777 [robbery victim kills accomplice]; [*People v.*] *Gilbert*, *supra*, [63] Cal.2d 690 [police officer kills accomplice].)" (*People v. Cervantes*, *supra*, 26 Cal.4th at p. 867.)

In *Gilbert*, the court recognized "that entirely apart from the felony-murder rule, malice may be established when a *defendant initiates a gun battle*, and that under such circumstances he may be convicted of murder for a killing committed by another." (*People v. Gilbert*, *supra*, 63 Cal.2d at p. 703, italics added.) "Such malice is implied under . . . section 188 when the defendant or his accomplice, "'for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death."' [Citations.] *Initiating a gun battle is such an act.*" (*People v. Gilbert*, *supra*, at p. 704; italics added.)

The provocative act doctrine "requires proof that the defendant personally harbored the mental state of malice, and either the defendant or an accomplice intentionally committed a provocative act that proximately caused an unlawful killing. [Citations.] A provocative act is one that goes beyond what is necessary to accomplish an underlying crime and is dangerous to human life because it is highly probable to

9

provoke a deadly response." (*Gonzalez*, *supra*, 54 Cal.4th at p. 655; see CALCRIM No. 560.)

In addition to establishing implied malice, in a provocative act murder case, the prosecution must show that the provocative act *proximately caused* an unlawful death. ""'"In all homicide cases in which the conduct of an intermediary is the actual cause of death, the defendant's liability will depend on whether it can be demonstrated that [the defendant's] own conduct *proximately* caused the victim's death . . . ." [Citation.] "[I]f the eventual victim's death is not the natural and probable consequence of a defendant's act, then liability cannot attach." [Citation.]' [Citation.]" (*Gonzalez*, *supra*, 54 Cal.4th at p. 655.)

Some cases have stated that provocative act murder liability requires a "'life-threatening act'" that provokes a deadly response. (*Gonzalez*, *supra*, 54 Cal.4th at p. 656.) Our high court in *Gonzalez* explained that "the phrase 'life-threatening act' is essentially a shorthand definition that restates the proximate cause requirement of provocative act murder." (*Id*. at pp. 656-557.) "A provocative act is conduct that is dangerous to human life, not necessarily in and of itself, but because, in the circumstances, it is likely to elicit a deadly response. The danger addressed by the provocative act doctrine is not measured by the violence of the defendant's conduct alone, but also by the likelihood of a violent response." (*Id*. at p. 657.)

10

"When the defendant commits an inherently dangerous felony, the victim's self-defensive killing is generally found to be a natural and probable response to the defendant's act, and not an independent intervening cause that relieves the defendant of liability. [Citations.] The question of proximate cause is ordinarily decided by the jury, unless undisputed evidence reveals 'a cause so remote that a court may properly decide that no rational trier of fact could find the needed nexus.' [Citation.]" (*Gonzalez*, *supra*, 54 Cal.4th at pp. 655-656; see *People v. Concha* (2009) 47 Cal.4th 653, 661.)

C. *Discussion*

F.L. contends that the Petition did not adequately advise him that he was being charged with second degree murder based on any underlying crimes, other than attempted murder.

### 1. Implied Malice

The Petition alleges in the first count ("Paragraph 1") that "minor committed a violation of . . . section 187, subdivision (a), a felony, in that on or about 8/07/2020, in the County of Riverside, State of California, the minor did willfully and unlawfully murder JASON VERDUGO, a human being. [¶] It is further alleged that in the commission and attempted commission of the above offense the minor personally and intentionally discharged a firearm and proximately caused great bodily injury and death to another person, not an accomplice, within the meaning of . . . sections 12022.53, subdivision (d) and 1192.7, subdivision (c)(8)." Paragraph 2 of the Petition alleges: "minor committed a violation of . . . section 187, subdivision (a), a felony, in that on or

11

about 8/07/2020, in the County of Riverside, State of California, the minor did willfully and unlawfully murder GABRIELA . . . , a human being."

The record contains substantial evidence that under *Gonzalez*, *supra*, 54 Cal.4th 643, F.L. committed the provocative act of shooting at the Yaris, which provoked A.B. to return fire, resulting in the killing of Jason and Gabriela. There was evidence of an encounter between B.B. and F.L. inside the Metro PCS Store. Then, when B.B. left the store, F.L. aggressively stared at B.B. in the parking lot. F.L. looked at B.B. up and down, and then said to him, "'wassup.'" B.B. believed F.L. was "mad-dogging him." B.B. ignored the incident but was troubled by it. He returned to the car, got in, and left with A.B. Then, while B.B. and A.B. were stopped at a traffic light, B.B. saw the vehicle F.L. was riding in pull ahead, accelerating past B.B. and A.B.'s vehicle, while F.L. fired a gun at the Yaris, striking it several times. In response, B.B. handed A.B. a gun, and A.B. fired at F.L.'s vehicle as B.B. drove away from F.L.'s vehicle. As a consequence of A.B. returning fire, Jason was shot and killed, causing him to lose control of his vehicle. This resulted in the SUV hitting and killing a pedestrian, Gabriela.

F.L.'s life-threatening act of firing a gun multiple times at the Yaris was a provocative act, which provoked a lethal response from A.B., and was a substantial factor contributing to the victims' deaths, and thus was a proximate cause of their deaths. (*Gonzalez*, *supra*, 54 Cal.4th at p. 657.) A.B.'s intervention (firing back at F.L.) was not a superseding cause of the deaths because it was reasonably foreseeable under the circumstances that A.B. or B.B. would return fire. As the court in *Gonzalez* noted, "it is

12

reasonably foreseeable that a crime victim will use force in self-defense." (*Id.* at p. 658.) A rational fact finder could find that F.L. acted with implied malice by willfully shooting at the Yaris. The natural and probable consequence of such act was dangerous to human life, and F.L. knowingly acted with conscious disregard for the danger to life that the act posed. (*Id.* at p. 667; *People v. Concha*, *supra*, 47 Cal.4th at p. 661 ["[W]here the defendant perpetrates an inherently dangerous felony, the victim's self-defensive killing is a natural and probable response."])

Although the juvenile court found not true counts 3 and 4 for attempted murder of A.B. and B.B. because there was insufficient evidence that F.L. intended to kill them, there was ample evidence of implied malice required to prove counts 1 and 2 for second degree murder of Jason and Gabriela. There was substantial evidence that F.L. acted with wanton disregard for human life when he fired a gun at A.B. and B.B.'s vehicle, while B.B. was driving it on a public street, alongside other vehicles. The court explained that there was evidence that B.B. "knew that there might be some confrontation. And in anticipation of what might occur, it's my assessment that he had pulled out the gun from the center console, pulled the slider back, loaded it and gave it to his brother [A.B.]. Nothing would have happened after that had [F.L.] not done what he did which is problematic in this case. . . . [F.L.] . . . brandished his gun, fired the initial shots, and [A.B.] was able to respond quickly coming out of the passenger window, unloading into the green SUV all the ammunition in his gun. . . ."

13

F.L. argues the court erred in finding he committed murder because he did not intend to kill A.B. or B.B. or anyone else when he fired at their car. But even assuming, as the juvenile court found, there was insufficient evidence that F.L. intended to kill anyone when he fired at the Yaris, there was substantial evidence of implied malice sufficient to support provocative act murder in the second degree, which does not require a premeditated and deliberate intent to kill. (*Gonzalez*, *supra*, 54 Cal.4th at p. 653.) There was ample evidence that F.L. willfully fired a gun at the car, which was dangerous to human life. Such circumstances also supported a finding that F.L. knowingly acted with conscious disregard for the danger to life of those in the car and nearby. (*Id*. at p. 653 ["Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses"]; *People v. Concha*, *supra*, 47 Cal.4th at p. 662.)

As the court in *Concha* noted, "'[i]n the classic provocative act murder prosecution, *malice is implied* from the provocative act, and the resulting crime is murder in the second degree.' [Citation.]" (*People v. Concha*, *supra*, 47 Cal.4th at pp. 662-663.) Provocative act murder is "merely shorthand used 'for that category of intervening-act causation cases in which, during commission of a crime, the intermediary (i.e., a police officer or crime victim) is provoked by the defendant's conduct into [a response that results] in someone's death.' [Citation.]" (*Id*. at p. 663.)

14

F.L. argues that "[t]he record provides no substantial evidence to support minor having committed an act dangerous to human life and with conscious disregard for life other [than] necessary simply to have committed these offenses." As discussed above regarding implied malice, there is ample evidence that F.L.'s act of firing multiple rounds at an occupied vehicle, traveling alongside other vehicles, on a public street qualified as an act dangerous to human life, committed with conscious disregard for human life. The evidence demonstrated that such act was far more serious and dangerous than the mere act necessary to commit assault with a firearm.

F.L. contends that the juvenile court's findings were inconsistent because the court found true the murder counts but found there was insufficient evidence of the attempted murder counts. There was no inconsistency in the findings. The juvenile court's findings that there was insufficient evidence to support the attempted murder charges, counts 3 and 4, are not inconsistent with the provocative act murder findings, because attempted murder requires a finding of specific intent to kill, whereas second degree, implied malice murder does not. (*Gonzalez*, *supra*, 54 Cal.4th at p. 653 ["While implied malice murder does not require an intent to kill, *attempted murder* does require a specific intent to kill."].) We, therefore, conclude there was more than sufficient evidence to support the court's finding that F.L. committed provocative act murder based on implied malice.

2. Due Process Notice of Underlying Crimes

F.L. argues that the juvenile court improperly based its findings of murder on unalleged court-devised underlying offenses, such as assault with a firearm (§ 245, subd.

15

(a)(2)) and shooting at an occupied vehicle (§ 246), none of which were alleged or require specific intent to kill. F.L. maintains that "[a]s to the conduct underlying the provocative act murders, the prosecution did not bring any allegations against minor other than attempted murder," which the juvenile court rejected. This is incorrect. The Petition alleges in counts 1 and 2 that F.L. committed provocative act murder by personally and intentionally discharging a firearm, proximately causing great bodily injury and death to another person under sections 12022.53, subdivision (d) and 1192.7, subdivision (c)(8). These allegations were sufficient to provide F.L. with notice and an opportunity to prepare and present a defense to the provocative act murder charges.

As we explained in *In re Jesse P.* (1992) 3 Cal.App.4th 1177, 1181, "[i]t has long been the law in California that an accusatory pleading charging of murder in a criminal case need not specify the degree or the manner in which the murder is committed and thus encompasses both first and second degree murder as well as voluntary and involuntary manslaughter. [Citations.]" In *Jesse P.*, the minor acknowledged this proposition but argued that it does not apply in a juvenile setting. He asserted that, "unlike in a criminal case where the defendant has the benefit of a transcript of the preliminary hearing or the grand jury proceedings, here '[a]ll appellant had was a Petition which did not give him or his counsel notice that he was being charged with first degree murder.'" (*Ibid*.) We rejected this argument, concluding that a more detailed recitation of the facts in the petition is not required. (*Id*. at pp. 1181-1182.)

16

We noted in *In re Jesse P.*, *supra*, 3 Cal.App.4th at page 1182, that, "[w]hile a juvenile does not have the right to a preliminary hearing, he does have other avenues available to learn more detail about the charge in addition to the petition.  As in adult proceedings, the minor can seek pretrial review of the sufficiency of the petition by way of motion akin to a demurrer.  [Citation.]"  As in *Jesse P.*, F.L. in this case did not raise any objection to the sufficiency of the petition allegations by demurrer or otherwise.  We further stated in *Jesse P.* that "[t]he minor is also entitled to a detention hearing at which time the probation officer is required to present a prima facie case that the minor committed the offense."  (*In re Jesse P.*, *supra*, at p. 182.)  In addition, the minor had access to notice of more detailed factual allegations against him through discovery, including obtaining copies of the police, arrest and crime reports relating to the pending matter.  (*Id.* at p. 1183.)

Even though the Petition does not allege that F.L. committed second degree murder or that F.L. committed provocative act murder based on specified underlying felonies, such as assault with a firearm or shooting at an occupied vehicle, F.L. received sufficient notice of the nature of the murder charges and the factual basis for them.  (*In re Jesse P.*, *supra*, 3 Cal.App.4th at p. 1183; *People v. Jones* (1990) 51 Cal.3d 294, 318.)  Furthermore, F.L. has not demonstrated he was prejudiced by the Petition not alleging the specific underlying crimes.

17

3. Ineffective Assistance of Counsel (IAC)

Alternatively, F.L. argues his attorney provided IAC by not objecting to the juvenile court finding of provocative act murder based on the unalleged crimes of assault with a firearm and shooting a gun at an occupied car. We reject this contention because defense counsel's failure to object did not constitute prejudicial or deficient representation. Establishing IAC requires showing that counsel's action was both deficient under prevailing professional norms and prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Hart* (1999) 20 Cal.4th 546, 623-624.) "'[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." [Citation.]' (*Strickland v. Washington*, *supra*, 466 U.S. at p. 689.)" (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1243.)

F.L.'s IAC objection is not cognizable. As discussed above, the murder counts were adequately alleged and proved. F.L.'s counsel was therefore under no obligation to interpose meritless objections to the court's finding of provocative act murder based on F.L.'s underlying provocative act of recklessly firing a gun at the Yaris. (*In re Lower* (1979) 100 Cal.App.3d 144, 149, fn. 3 ["[T]here is no obligation on the part of any attorney to embark on a program of fruitless, time-consuming, nonproductive motions which . . . may make a dandy record but be of little or no value to his client."].)

IV.

EXCLUSION OF EXPERT TESTIMONY ON

YOUTHFUL BRAIN DEVELOPMENT

F.L. contends the juvenile court abused its discretion by excluding during the jurisdiction hearing expert testimony concerning adolescent brain development. F.L. argues that exclusion of the testimony of Psychologist William H. Jones, Ph.D. was prejudicial and violated his federal and state constitutional rights to due process and to present a complete defense.

"'Expert opinion testimony is admissible only if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."' [Citations.] 'When expert opinion is offered, much must be left to the trial court's discretion.' [Citation.] The trial court has broad discretion in deciding whether to admit or exclude expert testimony [Citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion. [Citations.]" (*People v. McDowell* (2012) 54 Cal.4th 395, 425-26.)

At the jurisdiction hearing, F.L. requested to introduce expert testimony by Dr. Jones concerning F.L.'s inability to exercise mature judgment because of the biological immaturity of his brain. At the time of the charged crimes, F.L. was 16 years old. Defense counsel stated he wanted to introduce expert testimony by Dr. Jones to make sure the court was aware that brain development of an adolescent is not complete until a

male is approximately 25 years old, and "science has shown that they lack the ability to exercise mature judgment because of the biological immaturity of the brain."

The People argued Dr. Jones's proffered testimony was inadmissible during the jurisdiction hearing under sections 25, 29, and 29.2 (former § 21). The juvenile court acknowledged recent changes in the law regarding adolescents and brain development but noted the focus of those changes was on the disposition of a case and punishment, not guilt. The court noted that, as a result of these developments in the law, F.L.'s case was not transferred to adult criminal court. However, the juvenile court concluded the changes in the law regarding a minor's brain development do not affect the elements of implied malice murder, and it would be improper to allow expert testimony on F.L.'s mental state. The court added that, if F.L. wanted the court to know about the changes in the law and research done on adolescent brain development, F.L. could request judicial notice of the statutory changes and legislative history focusing on adolescent brain development. The juvenile court therefore excluded Dr. Jones's testimony as irrelevant and inadmissible

Citing *People v. Coddington* (2000) 23 Cal.4th 529, 582 and its progeny,[2] F.L. argues that Dr. Jones's expert testimony was admissible under sections 28 and 29. In *People v. Coddington*, *supra*, at page 582, the court affirmed the defendant's conviction for first degree murder. (*Id*. at p. 547.) The *Coddington* court stated that sections 28 and

---

[2] See, e.g., *People v. Harris* (2021) 60 Cal.App.5th 939; *In re Moore* (2021) 68 Cal.App.5th 434; *People v. Ramirez* (2021) 71 Cal.App.5th 970; and *In re Harper* (2022) 76 Cal.App.5th 450, 453.

20

29 "permit introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but do not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state." (*People v. Coddington*, *supra*, at p. 582.) The *Coddington* court reiterated that "Sections 28 and 29 do not preclude offering as a defense the absence of a mental state that is an element of a charged offense or presenting evidence in support of that defense. They preclude only expert opinion that the element was not present." (*Id*. at p. 583.) The *Coddington* court thus concluded that the "appellant was free to offer evidence that he suffered from a mental disease or defect as well as evidence about that disease or defect." (*Ibid*.)

In *In re Harper*, the petitioner argued that his youth at the time of the crime decreased his culpability and therefore his young age should be considered when determining whether sufficient evidence supported the robbery-murder special circumstance. (*In re Harper*, *supra*, 76 Cal.App.5th at p. 466.) We noted that several courts (*People v. Harris*, *supra*, 60 Cal.App.5th 939, *In re Moore*, *supra*, 68 Cal.App.5th 434, and *People v. Ramirez*, *supra*, 71 Cal.App.5th 970) recently concluded that, when determining whether a special circumstance applies, it is proper to consider the perpetrator's youth, particularly when determining whether the perpetrator acted with reckless disregard for human life. (*In re Harper*, *supra*, at pp. 467-472; see also *In re Moore*, *supra*, at pp. 439, 454; *People v. Ramirez*, *supra*, at pp. 990-991; *People v.*

21

*Pittman* (2023) 96 Cal.App.5th 400, 416-418.) This is because, as the court in *Harris* explained, the definition of reckless disregard for human life "encompasses both subjective and objective elements. The subjective element is the defendant's conscious disregard of risks known to him or her.'" (*People v. Harris*, *supra*, at pp. 960-961, quoting *People v. Clark* (2016) 63 Cal.4th 522, 617.)

None of the cases cited by F.L. are dispositive here on the admissibility of expert testimony regarding adolescent brain development, because the cited cases' facts, circumstances, and procedural postures differ from those in the instant case. Here, unlike the cited cases, the excluded evidence consisted of proposed expert testimony on adolescent brain development, which was offered during the guilt phase to refute malice. Also, unlike in *People v. Pittman*, *supra*, 96 Cal.App.5th at pages 416-418, the record shows that the trial court was well informed that the biological immaturity of the brain can affect the ability to exercise mature judgment, such that there was no need for expert testimony in this regard.

Even if Dr. Jones's expert testimony regarding adolescent brain development was admissible to show adolescents are physiologically predisposed to risky, impulsive decision making, excluding it was not an abuse of discretion and was harmless error under both *Chapman* and *Watson* (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Although the juvenile court found there was insufficient evidence to prove specific intent to kill, the juvenile court found true the provocative act murder charges based on a finding of implied malice. The court further

indicated there was no need for expert testimony on adolescent brain development because the court was already well aware of research on adolescent brain development and its impact on adolescent male behavior. The court noted that, as a result of these developments in the law, F.L.'s case was not transferred to the court of criminal jurisdiction.

When denying the expert testimony during the jurisdiction hearing, the juvenile court stated: "I actually have read the legislative findings of all the changes in the law to understand why the government has changed the way youths are treated differently than adults. And the legislative findings actually incorporate all the research that has been done to support the change in the law to focus on rehabilitation of youths. So I don't think you need to worry about the trier of fact not knowing that young men, such as your client, are not the same as young men who are 25 and older and the accompanying issues that go with youth. I mean, it's obvious. [¶] . . . I've read the research; so it's not lost on me. You can argue your case, and if your client needs to call the doctor in for disposition, that's a different story. But for the circumstances of the shooting, I don't think that the doctor adds anything to this hearing."

We conclude based on these comments and the record as a whole that the juvenile court did not abuse its discretion in excluding Dr. Jones's testimony. Furthermore, it is highly unlikely that, had the juvenile court permitted his testimony on adolescent brain development, the outcome would have been any different. Therefore, even if the court

23

erred in excluding it, doing so was harmless error. (*Chapman v. California*, *supra*, 386 U.S. at p. 24; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

V.

DISPOSITION

The true findings on the provocative act murder allegations (counts 1 & 2) are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
Acting P. J.

We concur:

MILLER
J.

FIELDS
J.